**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Andrew Charles THOMAS,**
**Defendant–Appellant.**

**No. 99–10355.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 17, 2000.

Filed May 8, 2000.

Rubin Salter, Jr., Tucson, Arizona, for the defendant-appellant.

Jerry R. Albert, Assistant United States Attorney, Tucson, Arizona, for the plaintiff-appellee.

Before: POLITZ,[1] REINHARDT, and HAWKINS, Circuit Judges.

1. The Honorable Henry A. Politz, Senior United States Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation.

REINHARDT, Circuit Judge:

We are asked to decide whether the sound of a package of marijuana being dropped into a vehicle is sufficiently distinctive to provide law enforcement officers reasonable suspicion to stop and search the vehicle. We conclude that it is not and reverse the defendant's convictions.

## I. Background

On December 23, 1997, agents of the Federal Bureau of Investigation (FBI) told Detective Daniel Jankowski of the Pima County Sheriff's Department that he "might want to pay particular attention to a certain house" in Tucson because there was "a suspicion that there was a possibility that there might be some narcotics" there. Jankowski began surveillance of the house that morning. He could see four cars at the house: a white Oldsmobile without license plates, a silver Pontiac Grand Am, and two cars that were disabled. At 9 a.m. he saw four individuals leave the house and drive off in the white Oldsmobile. Jankowski attempted to follow the car, lost it, and returned to continue surveillance of the house.

At approximately 1:30 p.m., Jankowski observed another man leave the residence with a bag, put the bag in the Grand Am, and drive away. This time, Jankowski radioed another officer and asked him to stop the Grand Am. That officer conducted the stop as requested, searched the bag, but found no evidence of narcotics.

At approximately 2:20 p.m., Jankowski observed a white Chevrolet El Camino, with two occupants, arrive at the house.[2] He noticed that the passenger, later identified as Michael Segovia, was one of the men who had left in the Oldsmobile that morning. The driver was the appellant, Andrew Thomas. Segovia got out of the El Camino and opened the garage door. Thomas then backed the vehicle half-way

into the garage. From his observation post, Jankowski could see only the southeast corner of the garage's interior, where a large number of ordinary household items were stacked. He could see the front end of the El Camino, but not its rear. Segovia and Thomas went inside the garage, completely out of Jankowski's sight.

At this point, Jankowski heard three or four thumps from inside the garage. His testimony varied as to what he believed those thumps were. On direct examination at the suppression hearing, Jankowski testified that it appeared "that something was being loaded into the back end of the El Camino." On cross-examination, Jankowski first repeated this general observation, but, when pressed by defense counsel, ultimately pronounced that the thumps were distinctively the sound of packages of marijuana:

> If you've ever seen a large bale of marijuana being dropped onto a—onto something, it makes a—like a flat-sounding kind of thump that, to me, is pretty distinctive at times.

Later, at trial, Jankowski testified: "It was my opinion that something was being placed into the back end of the El Camino or something was being done to the El Camino." He did not suggest during his trial testimony that he knew what was being placed into the vehicle, if indeed anything was.

After the thumping ended, Jankowski observed Thomas drive the El Camino out of the garage. Segovia closed the garage door and returned to the passenger seat, and the El Camino departed. The vehicle did not look any different than before.

Jankowski radioed two other officers to stop the El Camino. Upon doing so, these officers noticed the odor of marijuana coming from inside and saw what they believed was a controlled substance partially exposed in the vehicle's bed. They searched

---

**2.** The Chevrolet El Camino has a large bed in the rear like a pickup truck, but otherwise

resembles a large, low-riding muscle car like the Chevrolet Camaro.

the vehicle and found five packages of marijuana in the bed, each approximately 12 or 13 pounds in weight, and a 20–gauge shotgun behind the front seat. Thomas admitted possession of the marijuana and made other incriminating statements. Following the seizures, other officers were summoned to the house. They obtained consent from the lessee to search the garage and found more wrapped packages of marijuana in an adjoining bathroom. The lessee later informed FBI agents that Segovia had paid him to store the marijuana.

The district court denied Thomas's motion to suppress evidence found during and as a result of the officers' stop of the El Camino. A jury found him guilty of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846; possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1); and knowing possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a). It acquitted him of knowingly using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). The district court sentenced Thomas to 41 months in prison, to be followed by five years of supervised release. This appeal followed.

## II. Analysis

■ The Fourth Amendment allows government officials to conduct an investigatory stop of a vehicle only upon a showing of reasonable suspicion: "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Jimenez–Medina,* 173 F.3d 752, 754 (9th Cir.1999) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). Reasonable suspicion requires "specific, articulable facts" which, together with "objective and reasonable" inferences, form a basis for suspecting that a particular person is engaged in criminal conduct. *United States v. Hernandez–Alvarado,* 891 F.2d 1414, 1416 (9th Cir.1989). We review a district court's determination of reasonable suspicion de novo. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Thomas,* 863 F.2d 622, 625 (9th Cir.1988).

The government argues that three factors provided it with reasonable suspicion to stop the El Camino that Thomas was driving: (1) the information Detective Jankowski received from FBI agents notifying him that narcotics might possibly be located at the house; (2) Jankowski's observation of several people coming and going from the house; and (3) three or four thumps from the interior of the garage, which Jankowski stated at one point were the sounds of packages of marijuana being loaded into the El Camino. We consider each of these factors in turn.

### A. First Factor: The FBI Tip

■ The government first points to the information Detective Jankowski received from the FBI. If a police officer relies on information from another government agency in making an investigatory stop, that information must itself be based on reasonable suspicion. *United States v. Hensley,* 469 U.S. 221, 232–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). The officer cannot simply defer to the other agency's suspicion without establishing the articulable facts on which that suspicion is based. *Cf. Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest").

■ Jankowski testified that FBI agents told him that he "might want to pay particular attention to a certain house" based on "a suspicion that there was a possibility that there might be some narcotics" there. This is apparently all that Jankowski was told. The FBI's information was devoid of specifics: no information about the occupants of the house, vehicles involved, any particular suspicious conduct, or the kind of narcotics at issue. "When courts have upheld a finding of

reasonable suspicion, it has been on the basis of more particularized information." *Hernandez–Alvarado*, 891 F.2d at 1417 (listing cases). Moreover, the information was expressed in an exceedingly equivocal and attenuated manner: the "suspicion" of a "possibility" that there "might" be narcotics. It was entirely conjectural and conclusory. The government presented no evidence regarding the basis for the FBI's third degree of speculation. For all we know, the FBI's information was based on an anonymous tip providing the same speculative and unsupported assessment of the house.[3] As the Supreme Court recently reaffirmed, such a tip is insufficient to provide reasonable suspicion for an investigatory stop. *Florida v. J.L.*, —— U.S. ——, ——, 120 S.Ct. 1375, 1378, 146 L.Ed.2d 254 (2000).

■ Courts will uphold an investigatory stop based on a tip or other secondary information only when the information possesses sufficient indicia of reliability that are independently corroborated by the police. *See Florida v. J.L.*, —— U.S. at —— – ——, 120 S.Ct. at 1378–79 (holding stop invalid where anonymous tip "provided no predictive information and therefore left the police without means to test the informant's knowledge and credibility"); *Alabama v. White*, 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (in "close case," upholding stop based on corroboration of tip that particular individual, in possession of cocaine, would be leaving apartment at particular time to travel to particular motel). The FBI information here lacked any indicia of reliability and was too vague and generalized to play any part in the reasonable suspicion calculus. Even if suspicious activity had subsequently been observed at the house, any finding of reasonable suspicion would have to rest on that observation alone and not, in whole or in part, on the FBI tip.

### B. Second Factor: Comings and Goings

■ The second factor relied on by the government is Detective Jankowski's observation of people coming to and going from the house on December 23. Specifically, he observed four individuals, including Segovia, leave in the white Oldsmobile in the morning. Another person left with a bag in the Grand Am in the afternoon. Still later, Segovia and Thomas arrived and departed in the El Camino.

These comings and goings, the government contends, "were consistent with drug activity." This contention is correct only in the sense that the comings and goings were consistent with *any* form of activity. The number of arrivals and departures that Jankowski observed over the course of the morning and afternoon was not in any respect unusual, and the detective did not have any information as to whether the people coming and going were residents, family members, frequent visitors, or strangers.

Indeed, the only relevant evidence Jankowski possessed regarding the presence or absence of drug activity *contradicted* his theory that the house was used for drug trafficking. Jankowski had no information about the occupants of the white Oldsmobile, due to the fact that he had lost track of the vehicle soon after it left the house that morning. However, when, at Jankowski's request, two officers stopped and searched the Grand Am in the afternoon, after the driver had left the house carrying a bag, they did not find any narcotics in the bag. There is nothing suspicious about a man with a bag that the police know does *not* contain narcotics.

This court has accepted as indicia of illegal activity observations of evasive or erratic driving tactics or other furtive conduct by people coming to and going from a particular residence. *See, e.g., United States v. Del Vizo*, 918 F.2d 821, 826 (9th

---

**3.** At oral argument counsel for the government admitted forthrightly that the FBI information must be treated as nothing more than an anonymous tip.

Cir.1990) (driving in tandem and "counter-surveillance fashion"); *United States v. Garcia–Nunez,* 709 F.2d 559, 561 (9th Cir. 1983) (driving around block for counter-surveillance; upon signal from "lookout," men hurriedly walking to car from house and then sitting low in back seat). These are activities which may, when combined with other suspicious circumstances, give rise to reasonable suspicion. Jankowski observed no such activities here.[4] The unremarkable comings and goings observed by Jankowski at the house failed to provide the government with any indicia of illegal conduct that might form a part of a reasonable suspicion analysis, let alone a basis in itself for a reasonable suspicion finding.

### C. Third Factor: The Sound of Marijuana

█ That leaves as a possible basis for reasonable suspicion only the three or four thumps from within the garage heard by Detective Jankowski. When pressed on cross examination at the suppression hearing, Jankowski announced that he recognized the thumps as the sound of packages of marijuana being dropped into the El Camino.

█ The government argues that we should credit Jankowski's testimony because of his nineteen years of experience as a police officer and thousands of hours of "stash house" surveillance. But while courts analyze the facts leading to an investigatory stop in light of a trained officer's experience, these facts must be

"more than the mere subjective impressions of a particular officer." *Hernandez–Alvarado,* 891 F.2d at 1416. Reasonable suspicion must be based on more than an officer's "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Here, Jankowski testified that the dropping of marijuana packages—onto what surface he did not specify—made "a flat-sounding kind of thump" that, to him was "pretty" distinctive "at times." He could not describe the sound in any more detail, and he did not explain how it differed from thumps made by other kinds of packages.

We conclude that Jankowski's testimony does not support a finding of reasonable suspicion, but rather constitutes only an unsupported hunch. Marijuana has a distinctive appearance, taste, and odor, and perhaps even a feel, but it does not have a distinctive sound. This is true regardless of how it is packaged. At the time of Jankowski's surveillance, Thomas and Segovia were in the back of a garage that contained a large amount of household items. The thumps that Jankowski heard could have been generated by dropped 12– or 13–pound bags or bales of potting soil, cut grass, bird seed, dog food—anything. His claim that the thumps were the distinct sound of marijuana bales was, at best, a hunch or mere conjecture, not an objective and reasonable inference.[5]

Detective Jankowski's claim, moreover, was inconsistent with his other testimony

---

4. At oral argument, counsel for the government emphasized the fact that the white Oldsmobile, the vehicle that drove away in the morning, did not have a license plate. Of course, this violation would have permitted Detective Jankowski to stop the car, had he not lost it. However, nothing in the record explains how this fact relates to the question whether drug activity was taking place at the house from which the Oldsmobile departed. Indeed, we would expect that people involved with narcotics would be more careful to avoid such a flagrant vehicle violation in order to avoid being stopped by the police.

5. The government cites two decisions from other circuits that mention the "thudding" or "thumping" sounds of marijuana being offloaded from boats onto trucks: *United States v. Blasco,* 702 F.2d 1315, 1325 (11th Cir. 1983), and *United States v. Watkins,* 662 F.2d 1090, 1096 (4th Cir.1981). Both of these cases, however, rely on a multitude of other facts that clearly support reasonable suspicion. Neither suggests that marijuana bales have a distinctive sound which alone can turn facts such as those presented here into a basis for reasonable suspicion.

at the suppression hearing and trial. *See Rocha v. United States,* 387 F.2d 1019, 1021 (9th Cir.1967) ("In determining whether a district court erred in admitting evidence claimed to have been seized as the result of an unreasonable search, an appellate court will not ordinarily limit itself to the testimony received at a pretrial motion to suppress, but will also consider pertinent testimony given at the trial."). At the suppression hearing Jankowski testified on direct examination that he inferred from the thumps that "something was being loaded into the back end of the El Camino"—nothing more. It was only when defense counsel pressed him that Jankowski announced that he thought that what was being loaded was marijuana. Later, at trial, Jankowski testified that on hearing the thumping, "[i]t was my opinion that something was being placed into the back end of the El Camino *or something was being done to the El Camino*" (emphasis supplied). Again, he did not mention the distinctive sound of marijuana; indeed, he no longer seemed sure whether packages were being loaded into the El Camino at all. Detective Jankowski's conflicting testimony further undermined his already incredible claimed powers of auditory recognition.

### D. A Sum of Zeroes

We are aware that the reasonable suspicion calculus takes into consideration the totality of the circumstances. *See, e.g., United States v. Montero-Camargo,* 208 F.3d 1122, 1129–30 (9th Cir. 2000) (en banc). We are also aware that in certain circumstances conduct that is wholly lawful may nevertheless support a finding of reasonable suspicion. *United States v. Sokolow,* 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). As we have discussed, the government argues that three factors justified the investigatory stop: (1) a wholly conjectural and unsupported FBI tip; (2) a police detective's observation of two vehicles leaving the house, one in the early morning, the other in the early afternoon, with the stop of the second driver and the search of his bag revealing no marijuana or other contraband; and (3) the detective's extraordinary statement, inconsistent with his other testimony in the case, that he heard the distinctive sound of marijuana packages being loaded into a third vehicle. None of the three, considered separately, provides any basis for reasonable suspicion. Viewing them in their totality, they still add up to zero. There was no reasonable suspicion for Thomas's stop. It was, therefore, unlawful.

### III. Conclusion

A hunch may provide the basis for solid police work; it may trigger an investigation that uncovers facts that establish reasonable suspicion, probable cause, or even grounds for a conviction. A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment intrusion.

Because the investigatory stop of Thomas violated the Fourth Amendment, the district court was required to suppress the evidence that resulted from the stop as the fruit of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This evidence includes the marijuana, the shotgun, and Thomas's incriminating statements. It also includes the packages of marijuana found in the bathroom adjoining the garage at the residence under surveillance. As the district court found, "[t]he evidence obtained in the Thomas stop led Officers back to [the house at] 5825 East 23rd." Because there is at least a reasonable possibility that the evidence obtained as a result of the unlawful stop contributed to Thomas's convictions, we reverse those convictions and remand for further proceedings.

REVERSED AND REMANDED.