**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rigoberto FERNANDEZ–CASTILLO,**
**Defendant–Appellant.**

**No. 01–30398.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 2002.

Filed April 8, 2003.

**19.** *Id.* at 915.

**20.** *Id.* at 915–16.

where: (1) the vehicle had been reported as driving erratically; (2) the officer who stopped the vehicle knew the source of the report; (3) the report described the vehicle in detail, noting the car's color, make and model, and state license plate; (4) the report was made contemporaneously with the source's observations of the erratic driving; (5) the officer discovered the car in the area where the report indicated that the car would likely be found; (6) the officer noticed that the driver was sitting very close to the steering wheel, a behavior the officer knew was typical of impaired drivers; and (7) the officer corroborated the report of erratic driving by observing the car weave within its lane. Given the totality of these circumstances, we hold that the district court correctly found, after an evidentiary hearing, the existence of a reasonable suspicion that the operator of the car was impaired and properly held that the investigatory stop of the vehicle was constitutional.

I

On the afternoon of September 18, 2000, Montana Department of Transportation (MDOT) employees Jay Harvey and Terry Omland were traveling eastbound on Interstate 94 outside Miles City, Montana. They stopped on the median strip of the divided freeway to pick up debris and then re-entered traffic. Harvey was accelerating their state maintenance truck to highway speed when he noticed a car approach in his rear-view mirror. The car caught Harvey's attention because its left-turn signal light was blinking, but the car did not move to the left lane. Instead, the car straddled the center line of the two eastbound lanes. The car eventually passed Harvey and Omland's truck while traveling in the right lane. After it passed, the driver signaled and moved over into the left lane. After it did so, Harvey and Omland noticed the car cross the yellow

Robert Kelleher, Jr., Kelleher Law Office, Billings, MT, for the defendant-appellant.

Lori Harper Suek, Assistant United States Attorney, Great Falls, MT, and Shelley Hicks, Assistant United States Attorney, Billings, MT, for the plaintiff-appellee.

Before: FERGUSON, FISHER, and TALLMAN, Circuit Judges.

TALLMAN, Circuit Judge.

We are asked to decide whether an officer had a reasonable suspicion that the driver of a car was impaired, justifying an investigatory traffic stop of that car,

line that ran along the median. The car passed two other vehicles and then slowly drifted back to the right lane and across the fog line to the shoulder of the interstate. It then drifted back towards the left lane, where the driver-side tires touched the center line.

Concerned that the driver of the vehicle was impaired, Harvey and Omland decided to report their observations to the Montana Highway Patrol. In his twenty-two-year tenure at the MDOT, this was the second time Harvey had decided to report such erratic driving. Harvey radioed his MDOT dispatcher in Miles City. The MDOT dispatcher then relayed the report of erratic driving to the Montana Highway Patrol dispatcher. The MDOT dispatcher told the Highway Patrol dispatcher that "one of our guys" called in about an older model black Monte Carlo near milepost 116 on eastbound Interstate 94 whose driver was "evidently driving quite erratically." She stated that the car had North Dakota license plates that the MDOT employee thought read "7575." An MDOT log recorded the time of Harvey's report as 2:18 p.m.[1]

Officer Calvin Schock received the report of erratic driving at 2:21 p.m. from the Billings, Montana, Highway Patrol dispatcher while he was at his office in Miles City. The dispatch conveyed the following information: a black Monte Carlo with North Dakota license plates heading eastbound on Interstate 94 was seen driving erratically near milepost 116. The dispatch also indicated that the report came from the MDOT.

Officer Schock immediately left his office and headed westbound on Interstate 94 in an attempt to locate the black Monte Carlo. Near milepost 134, Schock saw a vehicle traveling eastbound that matched the described vehicle. As the car passed, Schock noticed that the driver was sitting very close to the steering wheel, a behavior that Schock, as a veteran traffic officer with eleven years of experience and hundreds of DUI arrests, associated with impaired drivers. Schock made a U-turn and began following the Monte Carlo. He activated his cruiser's video recorder and began filming the vehicle's driving performance. The car matched the description radioed-in by Harvey. Soon after he caught up to the Monte Carlo, Schock noticed the car drift in its lane and then observed "one rather large movement towards the center line and then back again."

As the patrol car got close to the Monte Carlo, the driver decided to exit into Miles City. Officer Schock stopped the car on the freeway exit off-ramp at milepost 138. At the suppression hearing, Schock explained why he stopped the Monte Carlo even though he did not personally observe the driver of the car commit a traffic violation, such as crossing the traffic lines:

> I probably would have followed [the car] a little longer if it had stayed on the interstate, but as the car started to take and go off the exit right at that time, it kind of raised the bar for me a little bit because now, if we're following it, if we do have an impaired driver, we're going to a—I know there's a stop sign at the end of the exit ramp. We're getting into two-lane traffic where traffic is oncoming. And I decided it would be better, safer for everybody, if I made the stop before we got into town.

After stopping the Monte Carlo, Schock approached the vehicle to contact the driver. As Fernandez rolled down the win-

---

1. In addition to the MDOT "Communication Emergency Incident Report" form, which logged Harvey's call, an audiotape recording of the MDOT call to the Highway Patrol and the Highway Patrol dispatcher's subsequent relay of the information to the officer in the field was introduced into evidence at the hearing.

dow, Schock immediately smelled marijuana coming from inside the car. Schock also noticed a piece of ash on the driver's lip. After determining that the driver, Rigoberto Fernandez–Castillo (Fernandez), was in the country illegally, Schock detained Fernandez on an immigration hold. Pursuant to a state search warrant, the car was later searched, and officers discovered over 500 grams of methamphetamine hidden in a speaker cabinet in the backseat. Fernandez was indicted by a federal grand jury on one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1).

Fernandez moved to suppress the evidence found in the search on the ground that the original traffic stop was not based on reasonable suspicion and was therefore a violation of the Fourth Amendment. After a suppression hearing, the district court found that the traffic stop was justified from its inception and denied the motion.

A jury found Fernandez guilty of the drug count charged in the indictment. Fernandez appeals, arguing that the district court erred by not suppressing evidence that was fruit of the unlawful stop of his car.[2] We affirm.

## II

■ We review de novo the district court's denial of a motion to suppress evidence. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Factual findings of the district court are reviewed for clear error. *United States v. Hammett,* 236 F.3d 1054, 1057 (9th Cir.2001).

■ Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, an investigatory traffic stop "is permissible under the Fourth Amendment if supported by reasonable suspicion." *Ornelas,* 517 U.S. at 693. In deciding whether Officer Schock had a reasonable suspicion that Fernandez was operating the Monte Carlo while impaired, which would justify the stop of Fernandez's car, we must, as the Supreme Court has repeatedly instructed us, consider the totality of the circumstances. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). All relevant factors must be considered in the reasonable suspicion calculus—even those factors that, in a different context, might be entirely innocuous. *Id.* at 277–78, 122 S.Ct. 744. The district court properly concluded on this factual record that the report of Fernandez's erratic driving observed and called-in by MDOT employees, coupled with Officer Schock's own corroborating observations, gave rise to a reasonable suspicion that Fernandez was impaired sufficient to justify an investigatory stop.

### A

■ We begin our analysis by discussing the relevance of the MDOT report conveyed to Officer Schock. For a third-party report of suspected criminal activity to form the basis of an officer's reasonable suspicion, that report must possess sufficient indicia of reliability. *See Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). For several reasons, we think the MDOT report was reliable and therefore must be considered in the reasonable suspicion calculus.[3]

---

**2.** Fernandez also challenges his conviction on two other grounds, which we address in a separate memorandum disposition filed contemporaneously with this opinion.

**3.** Even if unreliable, the tip would still be entitled to some weight under the totality of the circumstances test. But, as the Supreme Court recently emphasized in *J.L.,* an unreliable tip, *standing alone,* does not give an offi-

Most significantly, the report of erratic driving came from a known source: the MDOT. The MDOT dispatcher knew that MDOT employee Jay Harvey provided the report; indeed, Harvey's name was written as the source on the MDOT log introduced into evidence at the suppression hearing.

When relaying Harvey's report to the Highway Patrol, the MDOT dispatcher informed the Highway Patrol dispatcher that "one of our guys" called in the report and that the driver was "evidently driving quite erratically." Although the Highway Patrol dispatcher distilled and paraphrased this information in passing it on to Officer Schock, the dispatcher's knowledge is properly considered as part of our analysis of reasonable suspicion. *See United States v. Hensley*, 469 U.S. 221, 231–32, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. Robinson*, 536 F.2d 1298, 1300 (9th Cir.1976); *cf. Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1497 (9th Cir.1996). Thus Officer Schock reasonably—and correctly—assumed that the report came from a known source, an MDOT employee who had reported seeing the erratically driven Monte Carlo. We do not believe that the dispatch conveyed to Officer Schock must have contained the magic words "this report came from an MDOT employee who personally observed the erratic driving" as opposed to "this report came from MDOT"

in order for it to be considered reliable as coming from a known source.

The dissent's argument that the tip must be considered anonymous because Schock did not know which MDOT employee made the report is unfounded. There are simply not that many MDOT employees in Eastern Montana. And certainly there are even fewer MDOT employees working near Miles City. Officer Schock testified that he knew virtually all of the MDOT employees in the Miles City area. Though the MDOT dispatcher did not disclose Harvey's name to the Highway Patrol dispatcher, we think Harvey's identity could easily be ascertained by a simple inquiry.[4] In *J.L.*, the Supreme Court explained that anonymous tips are often unreliable because the tipster cannot be held accountable for fabrications and the tipster's reputation cannot be assessed. *J.L.*, 529 U.S. at 270, 120 S.Ct. 1375. Here, because a known MDOT complainant could be held accountable for fabricating any story, the concerns raised by anonymous tips are simply not present.

At the suppression hearing, Officer Schock testified that he *knew* the report of erratic driving came from the MDOT. This fact was significant to Schock. Officer Schock testified that he worked closely with MDOT personnel, had received reports of traffic infractions and hazards in the past from MDOT, and had found those reports to be reliable. Because Officer Schock was familiar with MDOT personnel

cer reasonable suspicion to effectuate a *Terry* stop. *J.L.*, 529 U.S. at 268, 120 S.Ct. 1375 (holding that a mere anonymous tip that a person is carrying a gun—without any corroborating evidence—does not provide a reasonable suspicion of criminal wrongdoing justifying the officer's stop and frisk of that person).

We note that *J.L.* is distinguishable from the case at bar. In contrast to *J.L.*, the "tip" in this case came from a known source. Also, the report was made contemporaneously with the informant's observation, and the officer discovered the car described in the dispatch

within minutes of the MDOT report. In *J.L.*, the record did not indicate how long the police waited before responding to the tip. *Id.* Finally, Officer Schock corroborated the report of erratic driving through his own independent observations. There was no corroboration of the alleged illegal activity in *J.L. Id.*

4. And, of course, Harvey's identity was ascertained since he testified at the suppression hearing.

in his area and trusted their reports, he was entitled to weigh that fact in responding to the dispatch he received. *See Adams*, 407 U.S. at 147, 92 S.Ct. 1921(holding that an unverified tip from a known informant was sufficiently reliable to justify a *Terry* stop and frisk).

Even if we assume, arguendo, that the report of erratic driving conveyed to Officer Schock was anonymous in nature, we still conclude that the report must be considered and given due weight in the reasonable suspicion calculus because the report possessed several indicia of reliability.

First, the report described the suspect car in detail. Officer Schock knew the car's color (black), make and model (a Chevrolet Monte Carlo), and that the car had North Dakota license plates.[5] Fernandez's car matched this description exactly.

Second, the detailed report provided the "predictive information" that the Supreme Court found lacking in *J.L. See* 529 U.S. at 271, 120 S.Ct. 1375. The report stated that the Monte Carlo was traveling eastbound on Interstate 94 in an erratic fashion, thereby indicating that the vehicle should be found further east of milepost 116. Indeed, Schock encountered the Monte Carlo in exactly the place one would expect it to be traveling and, as discussed in the following section, moving in a fashion that indicated that an impaired driver was at the wheel.

Third, Harvey and Omland called in the report of erratic driving immediately after watching the Monte Carlo weave across traffic lines, and Officer Schock could have readily deduced the contemporaneous nature of the report. The Highway Patrol dispatcher informed Officer Schock that the black Monte Carlo was observed driving erratically while eastbound on Interstate 94 near milepost 116. After leaving his office, Schock entered Interstate 94 near milepost 135. Traveling westbound, Schock almost immediately discovered the Monte Carlo at milepost 134. Given this chain of events, and the fact that the Monte Carlo had traveled only 18 miles from the location where MDOT had observed the erratic driving, Schock could have reasonably concluded that MDOT's observations were made only a short time before his own. Because reports made contemporaneously with a complainant's observations are generally more reliable than those reports made later in time, Schock could assign additional credence to the dispatch he received.

We therefore hold that the MDOT report possessed certain indicia of reliability and must be given due weight in determining, under the totality of the circumstances, whether Schock had a reasonable suspicion that the driver of the Monte Carlo was impaired.

**B**

■ We do not hold that the MDOT report, *standing alone*, provided Officer Schock with reasonable suspicion to stop

---

5. Harvey and Omland gave a more detailed description of the car to their MDOT dispatcher. The MDOT log introduced into evidence at the suppression hearing specifically noted that the Monte Carlo observed driving erratically was an older model and had the North Dakota license plate number "ND 7575." But Officer Schock was only informed by his Highway Patrol dispatcher that MDOT observed a black Monte Carlo with North Dakota plates. We think the report actually relayed to Officer Schock by the Highway Patrol dispatcher, while it omitted the license plate number of the Monte Carlo and that the Monte Carlo was an "older model," was sufficiently detailed. After locating a black Monte Carlo near milepost 135, which is where the car should have been found, Officer Schock could be reasonably certain that the car he followed was, in fact, the car described in the dispatch.

the car absent Officer Schock's own corroborating observations. That question is not before us. When determining reasonable suspicion, courts must examine the totality of the circumstances. *See, e.g., Arvizu,* 534 U.S. at 273, 122 S.Ct. 744. Here, other factors in addition to the MDOT report must be considered in the reasonable suspicion calculus.

After locating the black Monte Carlo described in the MDOT report, Officer Schock noticed that the driver was sitting very close to the steering wheel, a behavior that Schock knew was typical of impaired drivers. *See id.* at 277, 122 S.Ct. 744(explaining that due weight must be given "to the factual inferences drawn by the law enforcement officer"); *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (explaining that a court's review of evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement"). Schock testified that a driver sitting very close to the steering wheel could indicate that the driver was impaired and trying to concentrate on the road or compensate for a loss of peripheral vision due to drugs or alcohol.

Schock also observed Fernandez drift— rather appreciably as we can see on the videotape—to one side of his lane and then back to the other side. When following Fernandez, Schock drove over the same patch of road, which did have some ruts, but he did not perceive any ruts or wind that may have accounted for the Monte Carlo's weaving since neither had any effect on Schock's car. While weaving within one's lane of travel is not against the law in Montana, Schock reasonably associated this type of driving as consistent with the behavior of an impaired driver.[6]

We are mindful of our circuit's pre-*Arvizu* precedent that the dissent cites for the proposition that "movement within one's own lane ... is not a sufficient ground on which to base reasonable suspicion." But these cases are distinguishable from the case before us. Each of these cases dealt with border patrol agents who suspected that a vehicle was transporting illegal immigrants or drugs. *See United States v. Jimenez–Medina,* 173 F.3d 752 (9th Cir. 1999) (suspected illegal immigrant smuggling); *United States v. Rodriguez,* 976 F.2d 592 (9th Cir.1992) (same); *United States v. Hernandez–Alvarado,* 891 F.2d 1414 (9th Cir.1989) (suspected drug smuggling). It is perfectly understandable that swerving within one's own lane of traffic would not support reasonable suspicion of smuggling, which has nothing to do with impairment, but that it would support Officer Schock's reasonable suspicion that Fernandez was operating a vehicle under the influence of drugs or alcohol.[7]

---

**6.** Standing alone, Officer Schock's observations of the Monte Carlo weaving within its lane might not have supported the investigatory stop of Fernandez's car. We recently declared an investigatory stop unconstitutional where the officer only observed the car for 35–45 seconds before stopping the driver, and the "weave" observed by the officer was not pronounced. *United States v. Colin,* 314 F.3d 439, 445–46 (9th Cir.2002). Our decision in *Colin* expressly left open the possibility that "pronounced weaving" or weaving for a "substantial distance" might give rise to a reasonable suspicion that the driver of the weaving car is intoxicated, thereby justifying an investigatory stop—even though the officer does not observe the driver commit a traffic infraction. *Id.* Regardless, the MDOT report and Fernandez's sitting close to the steering wheel make this case distinguishable from *Colin.*

**7.** This case is also distinguishable from *State v. Lafferty,* 291 Mont. 157, 967 P.2d 363 (1998). In that case, the Montana Supreme Court concluded that a dispatcher's report coupled with an officer's observation of the defendant's crossing the fog line were insufficient to create particularized suspicion that the driver was impaired. *Id.* at 366. But

As a result of the MDOT report of erratic driving coupled with his own independent observations, Officer Schock had a "particularized and objective basis" to suspect that the driver of the Monte Carlo was impaired. The investigatory stop of Fernandez's vehicle was therefore constitutional.[8]

### C

Contrary to the dissent's suggestion, our pre-*Arvizu* decisions in *United States v. Morales* and *United States v. Thomas* do not dictate a contrary result. In *Morales*, a Montana county sheriff's department received an anonymous tip that "a white 1989 Ford Taurus, bearing Washington license plate number 772 JJY, was transporting a pound of methamphetamine from Spokane to Missoula, Montana." 252 F.3d 1070, 1071 (9th Cir.2001). According to the tip, the car had already left Spokane and was on its way to Missoula. *Id.* Assuming that the car would be traveling on Interstate 90, the most direct route from Spokane to Missoula, local deputy sheriffs set up surveillance along Interstate 90. *Id.* at 1072. Deputies soon spotted a white Taurus, which matched the description given by the tipster. Deputies trailed the Taurus, but the driver did not commit any traffic violations that would warrant the police stopping the vehicle. *Id.* Finally, after following the car for thirty-two miles, deputies stopped the car.[9] *Id.*

In deciding that the stop of the Taurus was not supported by a reasonable suspicion of criminal wrongdoing, we noted several facts. First, the tip was from a completely anonymous source. "An anonymous tip standing alone," we explained, "does not demonstrate an informant's veracity or reliability because an anonymous tipster cannot be held accountable if he or she provides inaccurate information, and the police cannot assess the tipster's reputation." *Id.* at 1074(citing *J.L.*, 529 U.S.

---

significant to the court's analysis was the fact that the officer did not testify that his training or experience led him to infer that the behavior he observed was characteristic of an impaired driver. *Id.* Here, Schock not only testified to that effect but also provided reasons why sitting very close to the steering wheel and swerving in one's lane may indicate impairment.

8. According to the dissent, Officer Schock's observations must be disregarded because sitting close to the steering wheel and swerving once within a lane do not "constitute conduct that supports a finding of reasonable suspicion." We respectfully disagree on this record.

The Supreme Court expressly rejected the dissent's "divide-and-conquer analysis" in *United States v. Arvizu*, 534 U.S. at 274, 122 S.Ct. 744. In *Arvizu*, the Court upheld an investigatory stop near the border where the officer who effectuated the stop observed, among other things, that: the driver appeared rigid and stiff in his posture; the children in the car artificially waved to the officer as if they were instructed; and the vehicle turned at an intersection to avoid a border checkpoint. *Id.* at 270–71, 122 S.Ct. 744. The Court conceded that these factors, taken alone, were "susceptible of innocent explanation." *Id.* at 277, 122 S.Ct. 744. But taken together, the Court held that these factors formed "a particularized and objective basis for[the officer's] stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment." *Id.* at 277–78, 122 S.Ct. 744. Watching a driver sit very close to his steering wheel and weave within his lane might not, standing alone, give rise to reasonable suspicion that the driver was impaired. *See supra*, note 6 (discussing our decision in *United States v. Colin*). But this type of behavior is highly relevant when, as in this case, there is also a reliable report of erratic driving.

9. Ultimately, the officers decided to stop the car because it had tinted windows. *Id.* at 1072. But tinted windows are only illegal in Montana for those cars registered in Montana. *Id.* On appeal, the government did not argue that the officers were in any way justified in stopping the vehicle because of the tinted windows. *Id.* at 1073.

at 270, 120 S.Ct. 1375). We then explained that the anonymous tip in that case did not possess sufficient indicia of reliability such that the tip provided reasonable suspicion. In particular, we noted that the tip lacked specifics. For example, the tipster never suggested that the car would be traveling on Interstate 90. *Id.* at 1076 ("The tip here speaks about location in[ ] general terms by only identifying 'Spokane' and 'Missoula.' "). We also noted that the deputies failed to corroborate the predictive information given in the tip through their own independent observations. The deputies never verified that the car was in fact traveling to Missoula, as the officers stopped the car thirty miles shy of that city. *Id.* at 1077(noting that although the deputies did corroborate the *identity* of the car with their own observations, "the tipster's ability to identify the car does not demonstrate that he or she had knowledge of concealed criminal activity").

In *Thomas*, we also declared that an anonymous tip did not possess sufficient indicia of reliability to support a finding of reasonable suspicion. 211 F.3d 1186 (9th Cir.2000). The "tip" in *Thomas* was forwarded by FBI agents to a local law enforcement officer in Pima County, Arizona. Agents told the officer "that he 'might want to pay particular attention to a certain house' in Tucson because there was 'a suspicion that there was a possibility that there might be some narcotics' there." *Id.* at 1188. Nothing in the record indicated why the FBI suspected drugs were present at the house. *Id.* at 1190.

Responding to the FBI tip, local officers began surveillance. An officer noticed several people entering and leaving the house. *Id.* at 1188. The officer then heard three or four "thumps" coming from inside the garage attached to the house. *Id.* The officer deduced from these thumps that something was being loaded into a

pick-up truck. Soon after the thumping stopped, an El Camino pick-up truck exited the garage. Believing that marijuana had been loaded into the back of the El Camino, officers stopped the vehicle and subsequently discovered several packages of the illegal substance. *Id.* at 1188–89.

We suppressed the evidence found in the search of the El Camino after finding that the investigatory stop was not supported by a reasonable suspicion of criminal wrongdoing. First, we noted that the FBI tip "was devoid of specifics." *Id.* at 1189. "[T]he information was expressed in an exceedingly equivocal and attenuated manner: the 'suspicion' of a 'possibility' that there 'might' be narcotics." *Id.* at 1190. Perhaps more problematic, the source of the FBI tip was unknown. "The government presented no evidence regarding the basis for the FBI's third degree of speculation." *Id.* Finally, we concluded that observing people enter and leave a residence and hearing three or four thumps in a garage did not amount to reasonable suspicion that drugs were in the El Camino. Though recognizing that wholly lawful conduct may support a finding of reasonable suspicion, we held that the sum of the observations, the noise, and the "conjectural and unsupported FBI tip" was zero. *Id.* at 1192. The officers, we therefore concluded, had no reasonable suspicion of criminal wrongdoing to stop the car. *Id.*

The investigatory stop of Fernandez's car is plainly distinguishable from the traffic stops in both *Morales* and *Thomas*. First and foremost, the report of erratic driving conveyed to Officer Schock came from a known source, the MDOT. While it is true that we declared the FBI tip in *Thomas* to be anonymous in nature, it does not follow that we must dismiss the MDOT report as similarly anonymous. As we have pointed out, the Montana Highway Patrol dispatcher knew that the report originated from an MDOT employee,[10] and the Highway Patrol dispatcher informed

---

**10.** The MDOT dispatcher informed the Montana Highway Patrol dispatcher that "one of

our guys" observed the erratic driving.

Officer Schock that the report came from MDOT. The basis of the MDOT report, therefore, was from first-hand observation; and those first hand observers—MDOT employees Harvey and Omland—could be held accountable for fabricating a story. In *Thomas*, the record simply did not indicate any information about the anonymous source who provided the FBI its "tip."

Second, the MDOT report possessed more indicia of reliability than either of the tips in *Morales* and *Thomas*. Unlike the tip in *Morales*, which did not even note the road on which the suspect car would be traveling, the MDOT report exactly described the route of the Monte Carlo (traveling eastbound on Interstate 94 from milepost 116). Officer Schock encountered the Monte Carlo precisely where one would expect the car to be traveling at freeway speeds (near milepost 134). In contrast to the tip in *Thomas*, the MDOT report was hardly devoid of specifics. The MDOT report described the erratically driving car in detail, noting the color, make and model, and North Dakota license plates of the suspect vehicle.

Finally, and most significantly, Officer Schock corroborated the report of erratic driving by observing the Monte Carlo weave within its lane and by noticing that the driver was sitting very close to the steering wheel. No such corroboration was present in either *Morales* or *Thomas*. In *Morales* the law enforcement officers never made any observations indicating that the driver of the Taurus was transporting methamphetamine. Arguably, there was some corroboration of the FBI tip in *Thomas*. The officer heard a thump, which he believed was the sound of marijuana being loaded into a pick-up truck. The officer also noticed several people enter and leave the residence. But in that case we recognized that the officer's observations were simply too attenuated from

the tip that drugs might be present at the residence to stop the car (the FBI tip identified that drugs *might* be present *at the house*; the report never indicated that residents of the house were transporting drugs in an El Camino) and too innocuous to factor into the calculus for reasonable suspicion of criminal wrongdoing.

Though perhaps innocent in other contexts, Fernandez's posture and driving performance were highly relevant here. These two facts tended to show that the driver of the Monte Carlo was probably impaired, corroborating the MDOT report. This case is not a sum of zeroes, as in *Thomas*. The totality of Officer Schock's observations added to the reliable MDOT report equaled reasonable suspicion sufficient to stop the car and investigate further.

## III

Officer Schock, as an experienced traffic officer, suspected that the driver of the Monte Carlo was impaired. If Schock's suspicion was objectively reasonable, the investigatory stop of Fernandez's car must be upheld as the district court concluded. Given the totality of the circumstances in this case, Schock's suspicion was reasonable. The district court properly refused to suppress evidence found in the subsequent search of the vehicle.

**AFFIRMED.**

FERGUSON, Circuit Judge, dissenting.

I respectfully dissent. Without ever announcing that it is doing so, the majority's opinion effectively overrules a significant portion of our prior Fourth Amendment jurisprudence. The majority finds that an essentially anonymous tip of allegedly "erratic driving," "corroborated" only by an officer's observation of arguably innocent and certainly non-criminal behavior, is suf-

ficient to support a finding of reasonable suspicion. In coming to this conclusion, the majority systematically brushes aside our precedent and misstates the facts of this case. In particular, the majority (1) misconstrues our prior case law which requires that when a dispatch does not provide information about the factual underpinnings of a tip, the tip must be treated as anonymous; (2) allows a dispatcher to instruct an officer to stop anyone, at any time, without any stated basis, even if the dispatcher does not have a legally sufficient reason for asking her or him to do so; (3) implies that any state employee, regardless of training or expertise, may be accorded the same deference as law enforcement personnel provided she or he lives in a sparsely populated area; and (4) fails to abide by our prior case law which instructs that neither minor weaving within one's lane nor sitting close to the steering wheel, either together or separately, constitute conduct that supports a finding of reasonable suspicion.

"The Fourth Amendment allows government officials to conduct an investigatory stop of a vehicle only upon a showing of reasonable suspicion: 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Thomas*, 211 F.3d 1186, 1189(9th Cir.2000) (quoting *United States v. Jimenez–Medina*, 173 F.3d 752, 754 (9th Cir.1999)). Although reasonable suspicion is determined under the "totality of the circumstances," *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), officers must still have an *objectively* reasonable basis for suspecting legal wrongdoing; "a mere 'hunch' is insufficient to justify a stop." *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744. "Courts will uphold an investigatory stop based on a tip or other secondary information only when the information possesses sufficient indicia of reliability that are independently corroborated by the police." *Thomas*, 211 F.3d at 1189. In the instant case, none of these requirements are met and, as a result, the stop in the instant case must be held to be unconstitutional.

## I.  Factual Background

I begin with a brief recitation of the facts that are relevant to our determination of this matter. On the afternoon of September 18, 2000, two Montana Department of Transportation ("MDOT") employees, Harvey and Omland, called in a report of "erratic driving" to their main office in Miles City. The Miles City office then relayed the report to the Montana Highway Patrol dispatcher ("MHP Dispatch"). The exact specifics of what Harvey and Omland reported to their headquarters is not recorded and was never transmitted to the Montana Highway Patrol.[1] What is re-

---

**1.** Because the information was never communicated to Officer Schock, the majority's discussion of what Harvey and Omland witnessed is irrelevant. *See* Maj. Op. at 1115. Even if it was relevant, however, the majority misrepresents what occurred. The majority fails to mention that, as Harvey and Omland's truck was pulling onto the highway, two other cars passed in the "driving" or right-hand lane. As a result, Fernandez–Castillo's car was not signaling for a mysterious, unknown reason, but apparently because he had been preparing to pass the two cars. The majority makes much of the fact that, despite his signaling, Fernandez did not enter the left-hand

or "passing" lane, instead straddling the driving and passing lanes for less than a minute. Maj. Op. at 1115. As Harvey admitted at the suppression hearing, however, this was not necessarily improper, given that the MDOT vehicle was about to enter into the left-hand lane at a slow speed. A responsible driver would have waited to see what the truck would do. Harvey also admitted the Fernandez's behavior in passing the two cars was proper, as he waited until he passed the MDOT truck before signaling, then merged into the passing lane, passed the cars, then signaled again before returning to the driving lane. The only clearly incorrect thing Fer-

corded is the transmission from the Miles City MDOT to MHP Dispatch, and MHP Dispatch's subsequent call to Officer Schock. As the majority acknowledges, Maj. Op. at 1116, based on these calls, all that Officer Schock knew at the time that he made the stop was that MDOT had called in a report to his dispatch of an "erratically" driven black Monte Carlo with North Dakota plates, traveling eastward on a particular stretch of highway.

## II. The Majority's Holding Directly Conflicts with our Decisions in *United States v. Morales and United States v. Thomas*

The majority begins from the flawed assumption that the "tip" had such indicia of reliability that only minimum, if any, corroboration was required in order to allow Officer Schock to find reasonable suspicion. However, under our prior precedent, the "tip" must be treated as anonymous and cannot form even a partial basis for finding reasonable suspicion in the instant case.

In *United States v. Thomas*, we held that a tip from the FBI was not sufficiently reliable to serve as even a partial basis for reasonable suspicion when the information was "devoid of specifics" relating to criminal conduct and was "entirely conjectural and conclusory." *Thomas*, 211 F.3d at 1189–90. In *United States v. Morales*, we articulated the test succinctly: if a dispatch does not contain information about the tip's source, "the tip should be treated as anonymous." 252 F.3d 1070, 1074 (9th Cir.2001) (holding that tip provided to an officer by another police department via an "Attempt to Locate" dispatch, that did not include information

about the tip's source, is treated as anonymous). The majority's attempt to distinguish the tip in this case from those we determined to be anonymous in *United States v. Morales* and *United States v. Thomas* is entirely unpersuasive.

The facts surrounding the tip in the instant case are virtually indistinguishable from those at play in *Thomas*. At the suppression hearing, Schock testified that he knew nothing about the reliability of the person who made the report and that, for all he knew at the time of the stop, the tip could have come from an anonymous caller to the MDOT. More importantly, Schock admitted he lacked any information about the basis of the informant's assessment of the car's driving. Schock testified that the dispatch contained no details about the car's driving other than it being "erratic" and no allegation that it had violated any traffic laws. Schock was not informed that Harvey had witnessed the vehicle straddle the center lane or cross the fog lane, nor was he informed that Harvey had made his observations contemporaneously with his report. Schock's position is thus indistinguishable from that of the officers in *Thomas*, who knew that the FBI had provided the tip, but who knew none of the facts upon which the tip was based.[2] As a result, the tip in the instant case must be treated as anonymous.

The majority cites *United States v. Hensley, United States v. Robinson,* and *Easyriders Freedom F.I.G.H.T. v. Hannigan* for the proposition that "the dispatcher's knowledge is properly considered as part of our analysis." Maj. Op. at 1118. This is beside the point. Of course trained and experienced officers are entitled to

---

nandez did was to allow the left side of his car to cross over the fog line, once, on the far-left of the highway after he merged into the passing lane.

**2.** Indeed, unlike in the instant case, the officers in *Thomas* actually had a clear allegation

of criminal activity, as they had been told that there was "a suspicion that there was a possibility that there might be some narcotics" in the house. *Thomas*, 211 F.3d at 1189.

rely on one another's inferences to establish reasonable suspicion.[3] However, the majority's reasoning creates a broad proposition that dispatchers no longer have to communicate the basis for the information they are conveying or even base their own dispatches on reasonable suspicion. Nothing in the holdings of any of these cases provide support for such a proposition. While *Hensley* and *Robinson* permit an officer to rely on a dispatcher's instructions, this is so only if "the dispatcher himself had[ ] founded suspicion, or ... information from a reliable informant who supplied him with adequate facts to establish founded suspicion." *Robinson,* 536 F.2d 1298, 1300 (9th Cir.1976). In the instant case, the dispatcher had only a bare allegation of erratic driving, not "articulable facts supporting[ ] reasonable suspicion that the wanted person has committed an offense." *Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

The majority's reasoning would allow dispatcher to instruct an officer to pick up anyone, at any time, without any stated basis, even if the dispatcher does not have a legally sufficient reason for asking her to do so. This is exactly the kind of behavior which the Fourth Amendment was created to guard against and exactly the behavior to which *Morales* and *Thomas* respond by imposing a more stringent requirement. *Thomas* and *Morales* instruct that the basis for law enforcement inferences must be explicitly communicated, regardless of whether one lives in a small town or a huge metropolis, and regardless of whether a police officer has previously worked with the agency providing the tip. There

is no doubt that police officers frequently work closely with the FBI, the cooperative agency in *Thomas,* yet the presence of this kind of relationship does not and must not eliminate the requirement that an officer have an objective, factual basis to support a finding of reasonable suspicion.[4]

The majority attempts to bolster its argument by relying on *Florida v. J.L.* for the proposition that because Officer Schock lived in a small town and could easily locate the party who called in the tip, it need not be treated as anonymous. Maj. Op. at 1118–1119. First, the majority's suggestion that the Fourth Amendment protections are lessened for those who live in or travel through sparsely populated areas is completely untenable. "The search and seizure protections of the Fourth Amendment [do not vary from place to place and from time to time.]" *Whren v. United States,* 517 U.S. 806, 815, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Second, nothing in the *J.L.* decision suggests such a broad exception to its general holding that an "anonymous call ... [that] provide[s] no predictive information and therefore [leaves] the police without means to test the informant's knowledge or credibility" does not provide the "moderate indicia of reliability" required for reasonable suspicion. *Florida v. J.L.,* 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). The point is not whether the police can potentially find the informant and interrogate him to determine if he is telling the truth, the point is that officers must have sufficiently specific information, relating to criminal conduct, that they can use to independently corroborate the tip.

---

**3.** *See, e.g., Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) (officers called upon to execute a search warrant entitled to assume that probable cause has been established but "an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.").

**4.** In an era in which law enforcement and other government agencies are being actively encouraged to work cooperatively with one another in all aspects of civic life, the sweeping ramifications of the majority's reasoning in this respect should be apparent.

The fact that an informant's identity is eventually ascertained is completely irrelevant. It is established beyond question that the focus of a fourth amendment intrusion analysis is "whether the officer's action was justified *at its inception.*" *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (emphasis added). The majority's position would allow law enforcement to evade this requirement by "cleaning up" unconstitutional searches and seizures through subsequent investigation.

We have previously held that in order for an anonymous tip to serve as the basis for reasonable suspicion, it: "must include 'a range of details' ... [that] cannot simply describe easily observed facts and conditions, but must [provide predictive information that is] ... corroborated by independent police observations." *Morales*, 252 F.3d at 1076. In addition, reasonable suspicion requires that a tip be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 271, 120 S.Ct. 1375.

In the instant case, none of the details provided in the tip provided grounds for believing that illegal conduct had occurred. Nor did they provide sufficient predictive information from which Officer Schock could have tested the tip's reliability. *See id.* The only possible "assertion of illegality" contained in the MDOT tip was the allegation of "erratic driving." As a threshold matter, such a vague and totally unspecific allegation of "erratic driving"

cannot legitimately be equated with an allegation of criminal activity.[5] More importantly, because it lacked any detail, the allegation of "erratic driving" in the instant case was too subjective and too vague to provide any type of meaningful predictive information. *See id.* What remains is the identifying information relied on by Schock in locating the car, information whose only value was its "tendency to identify a determinate person."

The majority appears to give the tip unwarranted credence because it came from a government agency (regardless of the fact that Officer Schock did not, in fact, know that it came from an employee of the agency). However, we have held that "an officer cannot simply defer to [another] agency's suspicion without establishing the articulable facts on which that suspicion was based." *Thomas*, 211 F.3d at 1189; *see also Morales*, 252 F.3d at 1076 n. 5. In the instant case, such unquestioning reliance on the tip is particularly troubling because MDOT is not a law enforcement agency, nor do its employees have the "experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744(quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). Harvey testified only that he had experience and training resurfacing roads and clearing debris, not identifying inebriated drivers.[6] The fact that

---

5. There is no question that this panel would hold unconstitutional a statute that prohibited simply "erratic driving," irrespective of the public safety interests that it sought to advance. Such a prohibition would be void for vagueness because it would not give fair notice to drivers as to the conduct prohibited. *See Bouie v. City of Columbia*, 378 U.S. 347, 350–51, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). I fail to see how the majority's position differs from such a law.

6. Harvey's lack of training and expertise is evident from the persistent inconsistencies in his testimony. For example, in his initial signed report he wrote that he saw "a young looking Hispanic male ... [with] some sort of white looking package in his left hand ... staring straight ahead ... like he was in a trance. He had several earrings and his hair was very shiny and combed straight back. Also, he didn't sit very high in the car." However, when asked at the suppression hearing what he was able to see of the person

Officer Schock "worked closely" with MDOT does not render this presumption of reliability permissible. No doubt police officers work closely with many state agencies, in many contexts, but this, in and of itself, simply does not give those agencies *carte blanche* to direct the activities of law enforcement, nor does it give police officers permission to stop people without independently establishing the facts necessary to support reasonable suspicion.

### III. Officer Schock's Observations Neither Corroborated the Tip Nor Provided Independent Reasonable Suspicion for the Stop

Even if the tip in the instant case can form a partial basis for Officer Schock's reasonable suspicion—and under our prior caselaw it does not—Schock was required to independently corroborate the facts upon which the tip was based. Officer Schock's own observations, however, neither corroborated the MDOT tip nor provided an independent basis for reasonable suspicion to stop the vehicle, as our recent cases make clear.

The majority concludes that Officer Schock "corroborated" the tip by matching the license plate state, model and color of the car, its direction of travel on the interstate, and, allegedly, its "erratic driving." Maj. Op. at 1120. Even if Officer Schock correctly confirmed the presence of a particular black Monte Carlo on a highway in Montana, however, this does not give rise to reasonable suspicion. At the risk of being repetitive, reasonable suspicion requires that a tip be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 271, 120 S.Ct. 1375. Officer Schock was required to corroborate the

allegation of "erratic driving," the only information that potentially indicated the possibility of illegal activity. However, because minor movement within one's own lane of traffic and sitting close to the steering wheel are simply not activities that, on their own, indicate criminal activity, it is simply untenable to suggest that they "corroborated" the erratic driving allegation.

Almost precisely this issue was addressed in our recent opinion in *United States v. Colin*, in which we held unconstitutional a stop performed under almost identical circumstances. 314 F.3d 439, 446 (9th Cir.2002). In *Colin*, the officer observed the vehicle for 35–45 seconds, during which time the vehicle:

> drove within the speed limit and properly activated his turn signals before making lane changes. [The officer] thought [the driver] was 'possibly' driving under the influence because the car's wheels touched the fog line on the right side of the right lane for 10 seconds and then, about 5–10 second later, touched the yellow line of the far left of the left lane for another 10 seconds.[7]

314 F.3d at 445. In coming to the conclusion that such conduct was not sufficient to constitute "pronounced weaving" or to justify a stop, the *Colin* court approvingly quoted the 10th Circuit, which noted that "if the failure to follow a perfect vector down the highway or keep one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy." *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir.1993), as quoted in 314 F.3d at 446.

---

driving he stated that he "just made a quick glance out through the window" and that "the only thing [he] noticed was that [he] got the impression the person was not very tall."

**7.** The officer's testimony in *Colin* as to why he thought this driving was a sign of impairment is almost identical to that of Officer Schock's. *See* 314 F.3d at 445 n. 4.

In the instant case, Officer Schock followed the car for less than three minutes, during which time he observed the vehicle "drifting within the lane, whereas it goes from the fog line to the center line and back." He did not witness the vehicle violate any traffic laws and, contrary to the officers in *Colin*, specifically testified at trial that he believed the behavior he personally observed did not warrant issuing a citation. Under *Colin*, these observations do not provide a basis for reasonable suspicion.

Our precedent prior to *Colin* is clear that common, non-illegal motorist behavior does not give rise to reasonable suspicion.[8]

> [B]ecause most people are not such paragons of driving skill and virtue that they consistently adhere to each one of the complex laws relating to the operation of motor vehicles, there are many opportunities to stop targeted vehicles ... But those opportunities are not limitless. Suspicions must be reasonable, and they cannot be if they are not sufficient to cause an officer to believe that the driver has done something illegal.

*United States v. Mariscal,* 285 F.3d 1127, 1130(9th Cir.2002) (holding that officer lacked reasonable suspicion to stop vehicle that was under surveillance on the basis of its making a right turn without signaling). This circuit has repeatedly held that movement within ones own lane or other relatively benign driving activity is not a sufficient ground on which to base reasonable suspicion, even when coupled with other suspicious circumstances. *See United States v. Jimenez–Medina,* 173 F.3d 752, 755 (9th Cir.1999) ("The law of this circuit teaches that the presence of such facts as driver preoccupation, slow speed, movement within one's own lane of traffic, and

even coming from the wrong neighborhood do not give rise to legally sufficient 'reasonable suspicion.' "); *United States v. Rodriguez,* 976 F.2d 592, 595–96(9th Cir. 1992) (observation of preoccupied driver in particular type of vehicle, swerving within his lane of traffic, on highway with reputation for alien smuggling, did not support reasonable suspicion); *United States v. Hernandez–Alvarado,* 891 F.2d 1414, 1418 (9th Cir.1989) (large reduction in speed of vehicle, driver's "nervous demeanor," license plate brackets from a dealership associated with drug trafficking, and driver's residence in neighborhood under investigation for narcotics activity, did not support a finding of reasonable suspicion); *see also State v. Lafferty,* 291 Mont. 157, 160, 967 P.2d 363 (1998) (dispatcher's report and officer's observation of defendant crossing the fog line were insufficient for particularized suspicion that defendant was driving under the influence). Our previous cases recognize that even considered altogether, as the totality of circumstances test requires, certain conduct is simply not sufficient to justify a traffic stop.

Sitting close to the steering wheel and swerving once within one's lane of traffic are not actions, either together or separately, or even in conjunction with a vague and unsubstantiated tip, that give rise to reasonable suspicion. Both activities, even in conjunction, are at least as likely to be subject to innocent explanations (for example, the driver could be inexperienced, short, new to the particular road upon which she or he is traveling, or all three) as they are to indicate criminal activity. In fact, Officer Schock testified that the highway surface contained both perpendicular dips as well as ruts caused by heavy truck traffic, both of which are factors that may have caused weaving.[9] Officer

---

**8.** Contrary to the majority's suggestion, Maj. Op. at 1121, nothing in these cases limits their application to cases involving smuggling.

**9.** While Officer Schock testified that he himself did not notice any weaving of his car because of the ruts, this does not necessarily mean that another driver with a lighter car or

Schock also stated that it would not be unreasonable for a person to make a minor swerve within her lane upon witnessing a police car approaching her from behind at speeds well over the legal limit. While conduct that is not necessarily indicative of criminal activity may, in certain circumstances, still be a consideration in the reasonable suspicion calculus, innocuous conduct alone does not justify an investigatory stop unless the presence of additional information or circumstances tend to indicate criminal activity has occurred or is about to take place. *United States v. Montero–Camargo*, 208 F.3d 1122, 1130 (9th Cir.2000) (en banc). No such additional information or circumstances were present in the instant case.

The majority asserts that because Officer Schock is an experienced officer, it was reasonable for him to associate sitting close to the steering wheel with intoxicated driving. Maj. Op. at 1120. Exactly this argument was rejected in *Colin* however. *Colin*, 314 F.3d at 445 n. 4. While "officers are encouraged to draw upon their ... experience in assessing the 'totality of the circumstances,'" *Colin*, 314 F.3d at 442, the deference we accord to officer experience is not "unbridled." *Hernandez–Alvarado*, 891 F.2d at 1416. "[The facts supporting reasonable suspicion] must ... be more than the mere subjective impressions of a particular officer. Permissible deductions or rational inferences must be grounded in objective facts and be capable of rational explanation." *Id.* In the instant case, Officer Schock's opinion that sitting near to the steering wheel is a sign of intoxication was entirely unsupported by objective fact. Moreover, the fact that Officer Schock did not conduct a sobriety field test or ask Fernandez–Castillo if he had been drinking or using drugs is indicative that Schock did not actually harbor

less familiarity with the roadway would not

reasonable suspicion that Fernandez–Castillo was impaired. *Colin*, 314 F.3d at 446.

In short, both the tip and the officer's observations, viewing them from Officer Schock's perspective at the time he made the stop, are objectively devoid of any evidence of criminality. "A hunch ... may trigger an investigation that uncovers facts that establish reasonable suspicion, probable cause, or even grounds for a conviction. A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment intrusion." *Thomas*, 211 F.3d at 1186; *see also Montero–Camargo*, 208 F.3d at 1129. The majority is essentially allowing a hunch based on a vague, anonymous, and uncorroborated allegation of erratic driving to support reasonable suspicion for an investigatory stop. I therefore dissent.

have been affected by these conditions.