**UNITED STATES of America,**
**Plaintiff,**

v.

**Billy Ray NEWMAN, Defendant.**

**No. CR02–965PHXROS.**

United States District Court,
D. Arizona.

May 13, 2003.

Milagros Anais Cisneros, Federal Public Defender's, Phoenix, AZ, for Defendant.

Roger W Dokken, Ann Birmingham Scheel, Keith Eric Vercauteren, US Attorney's Office, Phoenix, AZ, for U.S.

## ORDER

SILVER, District Judge.

Defendant Billy Ray Newman ("Newman") alleges that his Fourth Amendment rights were violated when his arresting officer arrested and searched him without probable cause. Newman moves to suppress the results of this allegedly illegal search. For the reasons given below, the Court grants the Motion.

## BACKGROUND

On September 24, 2002, the grand jury returned a three count Indictment against Newman as follows: Count 1, felon in possession of a firearm on June 14, 2002, in violation of 18 U.S.C. § 922(g)(1); Count 2, possession of methamphetamine with the intent to distribute in violation of 21 U.S.C. § 841(a); and Count 3, knowingly carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A).

The matter comes before the Court on Newman's Motion to Suppress (Doc. # 19). An evidentiary hearing occurred on February 20, 2003, followed by supplemental memoranda from both parties.

## FACTS

On June 14, 2002, while conducting neighborhood patrol, Phoenix Police Officers Nicholas Pittatsis and Stephen Roberts encountered a vehicle with a Utah license plate parked in front of a house at 5128 W. Monte Vista Road. The officers observed a woman sitting inside the vehicle on the driver's side and a man, Newman, standing at the trunk. Both officers had prior information concerning the occupants of the house and their vehicles. Moreover, both officers knew of prior illegal domestic violence occurring at the house and the recovery of stolen vehicles on the same street.

Not recognizing the woman and Newman as occupants of the house and unfamiliar with the vehicle, the officers suspected the vehicle was stolen. Officer Roberts instructed Officer Pittatsis to run a check on the vehicle. They confirmed that the vehicle was stolen, and the officers turned their car around and went back to the house.

As they pulled up to the house, the officers observed Newman leaving the vicinity of the vehicle and walk to the front door. Because Officer Pittatsis was physically closest to Newman at the time the officers parked their car, he took responsibility for Newman, while Officer Roberts focused on the woman.

From this point forward, the facts are vague because the memories of Officer Roberts and Pittatsis differ on material issues. Adding to the surfeit of obscurity, Officer Pittatsis' memory of the events differs significantly from what he recorded in his DR immediately after the events, what he stated during an individual interview with defense counsel, and what he testified to during the hearing held on February 20, 2003.[1]

## 1. Evidence Attributed to Officer Roberts

Officer Roberts completed a DR, interviewed with defense counsel, and testified at the Court's February 20, 2003 hearing

---

1. The Court notes that reasonable and honest memories may differ. Therefore, the Court declines to conclude that the officers intentionally gave untruthful information or testimony, nor does the Court imply bad faith from these inconsistencies.

regarding his recollection of the events surrounding Newman's arrest.

According to Officer Roberts, he approached the woman sitting in the vehicle and "asked her to turn off the ignition and hand·[him] the key." DR at12. When she did not respond, Officer Roberts repeated his question "several" times. *Id.;* IR at 5. In particular, during the hearing, Officer Roberts stated that he repeated his question "more than once" and "possibly three times." TR at 59. Officer Roberts admitted that his attention focused primarily on the woman and only partially on his partner, who took charge of Newman. *Id.* Eventually, the woman handed Officer Roberts the keys to the vehicle and he asked her to step out of the vehicle. *Id.* at 61; DR at 12. The woman stated " 'Don't tell me this car is stolen," ' and she became extremely nervous and upset. DR at 12; TR at 56. Then, either prior to leaving the car or while in the process of leaving the car, Officer Roberts asked the woman if the man standing at the front door with his partner was with her and if he had been in the car with her. DR at 12; TR at 69–70. The woman responded ambiguously: "Yes, that's my boyfriend." DR at 12; TR at 56. After receiving this information, Officer Roberts held up his index finger as a signal to Officer Pittatsis to arrest Newman. DR at 12; IR at 12; TR at 56. Officer Roberts explained that this signal represented that probable cause existed to arrest Newman for a crime, and that there was "no possibility of ambiguity" in the interpretation of the signal. TR at 80.

Officer Roberts initially estimated that "thirty seconds" transpired from the time he began interviewing the woman until he signaled Officer Pittatsis. TR at 83. However, after further questioning, he conceded that "[i]t might have been longer. It wasn't very long." TR at 84. Officer Roberts was emphatic, however, that when

he signaled to Officer Pittatsis, Newman was not yet in handcuffs. *Id.;* IR at 20; DR at 12. In Officer Roberts opinion, Officer Pittatsis saw his signal and responded by placing handcuffs on Newman. TR at 57. Officer Roberts did not recall that he later conversed with Officer Pittatsis about whether there was a connection between the woman and Newman. IR at 12–3; TR at 67. Moreover, Officer Roberts conceded that if such a conversation had occurred, he would "hopefully" have included it in his DR, but his DR fails to mention such a conversation with Officer Pittatsis. *Id.*

Officer Roberts explained that he questioned the woman regarding Newman because he did not believe that probable cause existed to arrest Newman when he pulled up to the house. IR at 15–6, 19; TR at 65–66. During an earlier interview, Officer Roberts also stated that at the time he questioned the woman, he did not know if Newman arrived in the car with the woman or exited from the house to greet her. *Id.*

## 2. Evidence Attributed to Officer Pittatsis

Officer Pittatsis also prepared a DR, was interviewed by defense counsel, and testified at the February 20, 2003 hearing regarding his recollection of the events surrounding Newman's arrest. However, unlike Officer Roberts, Officer Pittatsis' recollection of events changed with the passage of time.

In his DR, Officer Pittatsis wrote that he approached Newman, who was attempting to open a locked security door on the front of the house while holding a cellular phone and a brown wallet in his hands. DR at 5. Officer Pittatsis' DR then reads that he:

immediately conducted a pat down of Newman's waist area as a protective

measure for officer['s] safety reasons. During the pat down, [Officer Pittatsis] felt a hard object in Newman's back right jeans pocket and a bulging object in his front left jeans pocket. *[Officer Pittatsis] placed Newman under arrest* for his involvement with the stolen vehicle and handcuffed him behind his back, advising him of such.

*Id.* (emphasis added). Finally, in response to being placed under arrest, Newman "spontaneously" remarked " 'How can it be stolen if the keys are in it.' " *Id.* Shortly thereafter, Officer Pittatsis conducted a search incident to arrest and found two plastic sandwich baggies containing white powder, a plastic ziplock baggy containing white powder, drug paraphenalia, a .22 semi auto handgun, as well as Newman's personal items. *Id.* Inside Newman's wallet, Officer Pittatsis found a second ziplock baggy containing white powder. *Id.* Significantly, Officer Pittatsis' DR does not include any reference to either the hand signal or conversation with Officer Roberts as he brought Newman to the patrol vehicle.

Later, during the interview with defense counsel, Officer Pittatsis modified in material respects his recollection of what occurred. He told defense counsel that he approached Newman and immediately conducted an officer safety pat down. In contrast to his DR, he stated that he did not "immediately" place Newman under arrest but, instead, removed the .22 semi auto handgun during the pat down. IR at 21. Again, Officer Pittatsis did not mention observing Officer Roberts' signal or engaging in any conversation. Officer Pit-

tatsis offered his opinion that he believed probable cause existed to arrest Newman for the stolen vehicle because he was originally standing by the trunk and facing the driver. *Id.* at 10.

Officer Pittatsis' third and last recitation of the facts occurred during the February 20, 2003 hearing, when he clarified and corrected his earlier accounts. First, he explained that, after reviewing his DR, he realized that he mistakenly informed defense counsel that he removed the handgun from Newman during the pat down. TR at 13–4. Rather, Officer Pittatsis explained that he removed *no* objects from Newman's pockets, but "placed Mr. Newman in handcuffs, *detaining* him for ... being involved with a stolen vehicle." TR at 14 (emphasis added). Later, in response to further questioning and a refreshed memory, Officer Pittatsis unequivocally stated that at that moment he "arrested" Newman, and placed him in handcuffs. TR at 25 [2], 31–32.[3] Significantly, Officer Pittatsis also informed the Court that he understood the difference between an investigative detention and an arrest. TR at 31.

To clarify whether Officer Pittatsis placed Newman under arrest or merely detained him, the Court directly questioned Officer Pittatsis:

> THE COURT: ... When did that conversation occur with him [Newman] concerning the—or if it was a conversation, statements, remarks, comments, when did that occur with respect to your first encounter with him?

**2.** A. That I contacted him [Newman] and detained him.

> Q. And in your DR you wrote that you arrested him?
> A. Yes, it does say I arrested him.
> Q. Okay. Did you in fact arrest him?
> A. He was— *he was arrested, yes.*

> Q. Okay. Thank you.

**3.** Q. And when you initially put Mr. Newman in handcuffs, did you consider him under arrest, or where you detaining him to investigate his involvement in the stolen vehicle?

> A. According to my report, *I arrested him.*

THE WITNESS: That took place at my first encounter with him after I patted him down. *Then I handcuffed him and advised him that he was under arrest for his involvement with a stolen vehicle.*

. . .

THE COURT: Okay. Then tell me about the conversation you had.

THE WITNESS: According to my DR, that's when he asked—according to my report, that's when he asked me, "How is it stolen if the keys are in it?"

THE COURT: All right. So after you told him that he was arrested for his involvement with the car, did you specifically say just that, or did you say for theft of a vehicle?

THE WITNESS: I believe that I told him it was because the vehicle was stolen.

THE COURT: Okay. And so then he volunteered?

THE WITNESS: Yes.

TR at 33–4. Officer Pittatsis informed the Court that the volunteered, spontaneous comment made by Newman was: " 'How can it be stolen, the keys are in the car.' " TR at 16–7.

Officer Pittatsis concluded that probable cause existed to arrest Newman for the crime of stealing the vehicle based on prior information that Newman was not an occupant of the house, that domestic violence had occurred in the house, that stolen vehicles had been found on the street, that Newman stood by the trunk of the car and moved away to the house, and attempted to open the door while on a cell phone. Officer Pittatsis added that, based on his experience as a patrol officer, Newman's behavior was consistent with other suspects who demonstrate consciousness of guilt by attempting to flee or leave the scene of the crime. TR at 14.

Officer Pittatsis then led Newman to the patrol car, where he said he engaged in a "brief contact" with Officer Roberts, and Officer Roberts then advised him that Newman "was good for number one," i.e. probable cause existed to arrest him for his involvement with the stolen vehicle. TR at 15. Significantly, Officer Pittatsis did not recall in any of his three recitations of the facts that Officer Roberts used hand signals. TR at 16. According to Officer Pittatsis, he conducted his search approximately two minutes after pulling up to the house. TR at 26–7.

During questioning by the Court following the direct and cross-examination, Officer Pittatsis clarified the timing of the events. He explained that Officer Roberts' questioning of the woman occurred at the same time he questioned and arrested Newman. TR at 35–6. Moreover, Officer Pittatsis reiterated that he failed to recall any sharing of information between himself and Officer Roberts *prior* to his arrest of Newman. TR at 36–7.

## DISCUSSION

Officers Pittatsis and Roberts were the only witnesses who testified at the evidentiary hearing. Primarily, because their testimony contradicted each other on material issues, the evidence is not sufficient to establish probable cause existed at the time that Newman was arrested by Officer Pittatsis. In particular, considering the totality of the evidence existing at the time of the arrest, but particularly the testimony of Officer Pittatsis, the arresting officer, there is insufficient evidence to establish probable cause. Concomitantly, even if probable cause existed at the time Officer Roberts signaled Officer Pittatsis, because Officer Pittatsis was unaware of such communication, probable cause for the arrest was lacking.

### 1. Legal Standard

 Probable cause exists when police officers possess " 'reasonable trustwor-

thy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense,'" *United States v. Del Vizo,* 918 F.2d 821, 825 (9th Cir.1990) (quoting *United States v. Delgadillo-Velasquez,* 856 F.2d 1292, 1296 (9th Cir.1988)), and "must exist from facts and circumstances known to the officers *at the moment of the arrest.*" *Delgadillo-Velasquez,* 856 F.2d at 1298 (emphasis in original); *Rohde v. City of Roseburg,* 137 F.3d 1142, 1144 (9th Cir. 1998). The inquiry is determined from the point of arrest, "prior to any search conducted incident to the arrest." *Id.* at 825–26 (citing *United States v. Potter,* 895 F.2d 1231, 1233–34 (9th Cir.1990)). The test for probable cause is an objective test, although the experience and expertise of the police officer are relevant. *Terry v. Ohio,* 392 U.S. 1, 21–2, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For warrantless arrests, the government bears the burden of showing it did not violate the Fourth Amendment. *United States v. Valencia,* 24 F.3d 1106, 1108 (9th Cir.1994).

## A. The Defendant Was Not Held for an Investigative Detention

The Government argues that at first Officer Pittatsis merely detained Newman briefly, rather than arrested him. Under *Terry,* an officer may stop an individual, without probable cause, if she reasonably suspects criminal activity, question him briefly, and perform a limited pat down frisk for weapons. *Terry,* 392 U.S. at 22–24, 88 S.Ct. 1868; *Rohde,* 137 F.3d at 1144. To determine whether a *Terry* stop turned into an arrest, a Court must consider the "'totality of the circumstances.'" *United States v. Rousseau,* 257 F.3d 925, 929 (9th Cir.2001) (quoting *Del Vizo,* 918 F.2d at 824). The Court considers the intrusiveness of the stop and the justification for using such tactics. *Id.; Washington v. Lambert,* 98 F.3d 1181, 1185 (9th Cir.1996) (noting that when analyzing whether a

*Terry* stop or arrest occurred, the court considers (1) the aggressiveness of the methods used by police and the degree to which the suspects liberty was restricted and (2) whether the officer had sufficient basis to fear for his safety warranting a more intrusive action); *Del Vizo,* 918 F.2d at 824–5 (noting that brandishing of weapons and handcuffing of detainee does not necessarily convert *Terry* stop into arrest, but it is an arrest when the suspect is completely cooperative and there is no indication he is dangerous that would justify the officers' aggressive actions).

■ However, if the officer informs the detained individual he is under arrest, the detention is no longer considered a *Terry* stop. *Rohde,* 137 F.3d at 1144 ("In this case, however, the restraint of the Rohdes necessarily crossed the line from [an] investigatory stop to arrest because [the suspects] were told that they were under arrest. The officers' actions therefore constituted an arrest, which must be justified by probable cause."); *United States v. Delgadillo-Velasquez,* 856 F.2d 1292, 1295–6 (9th Cir.1988) (holding reasonable persons would not believe themselves free to leave after being *informed* they were under arrest and the police drew weapons on them, ordered them to halt, required them to lie face down on the street, and handcuffed them). Probable cause is required for the detention. *Id.*

## B. The Collective Knowledge Rule Does Not Establish Probable Cause

■ In *United States v. Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court established that the officer involved in a stop is not required to be personally aware of all the facts justifying the intrusion upon the defendant's Fourth Amendment rights. It suffices if the officer, aware of such facts, *relays* his reasonable suspicion to the offi-

cer effecting the *Terry* stop, *who may then rely upon it. Id.* This doctrine is understood to be the collective knowledge rule. In the Ninth Circuit and elsewhere it is applied in both the arrest and detention contexts. *See, e.g., Del Vizo,* 918 F.2d at 826.

In *United States v. Conner,* 948 F.Supp. 821, 841 (N.D.Iowa 1996), the District Court provided a thoughtful, detailed, and comparative history of the collective knowledge principle as applied among the various circuits, noting that in the Ninth Circuit, there is a requirement of "communication among the officers in order to invoke the [rule]," but that the opinions are somewhat confusing. At times the Ninth Circuit appears to hold that the collective knowledge rule is applicable even if the officer with reasonable suspicion neither relays the suspicion nor the underlying facts leading to his suspicion to the arresting officer. *Id.* at 841–42; *see, e.g., United States v. Butler,* 74 F.3d 916, 921 (9th Cir.1996) ("Probable cause can also be demonstrated through the collective knowledge of police officers involved in an investigation, even if some of the information known to other officers is not communicated to the arresting officer."); *United States v. Bernard,* 623 F.2d 551, 561 (9th Cir.1979) (holding collective knowledge rule allowed court to consider information possessed by officers never relayed to arresting officer because all officers "were working in close concert"). At other times, the Ninth Circuit has unmistakenly held that the collective knowledge rule applies only when there has been some material communication among the officers. *See, e.g., Valencia,* 24 F.3d at 1108; *Del Vizo,* 918 F.2d at 826. However, on close examination of the two doctrines, they can be reconciled. It is apparent that *some communication* actually did occur in the Ninth Circuit cases where the court did not expressly require it.

First, in *Butler,* one of the arresting officers received information during roll call that an informant reported that Butler induced the informant to accept a stolen vehicle as a trade-in and that the informant saw Butler with the stolen vehicle at a specific location. *Butler,* 74 F.3d at 919–20. The arresting officer then drove to the location, found a man matching the informant's description of Butler driving the stolen vehicle, and arrested him for possession of stolen property. *Id.* at 919. Butler argued that there was no probable cause at the time of the arrest because the arresting officer never conducted an independent investigation to corroborate the informant's crime report. *Id.* at 920. However, the Ninth Circuit disagreed, holding that an officer may arrest based on information *relayed* to him through official police channels. *Id.* (citing *United States v. Calhoun,* 542 F.2d 1094, 1100 (9th Cir.1976)).

Second, in *Bernard,* the arresting officer relied on the opinion of two other officers that probable cause existed to arrest. *Bernard,* 623 F.2d at 560. These other officers based their opinion on the observations of a fourth officer. *Id.* The observations of the fourth officer were never directly communicated to the arresting officer. *Id.* The Ninth Circuit held that the arresting officer could rely upon information known to the two other officers, including the information from the fourth officer that had not been directly shared with or communicated to him, because the two other officers did communicate their opinion regarding probable cause, including the information from the fourth officer. The court found that the arresting officer relied on the opinions "to a great degree" when making the final decision to arrest. *Id.*

Therefore, in both cases the Ninth Circuit followed the Supreme Court's ruling in

*Hensley,* requiring some minimal level of information regarding probable cause be communicated among the officers in order to apply the collective knowledge rule.

**2. Analysis**

■ The government contends probable cause existed when Officer Pittatsis arrested Newman because:

1) Officers knew that the car parked on the street ... was stolen.

2) Officers knew the house, in front of which the stolen car was parked, was known for illegal [domestic dispute] activity ....

3) The officers patrolled the neighborhood on a regular basis, knew the occupants of the house, and knew [Newman] and the [woman] driver ... did not live at the house.

4) When officers turned around to return to the house after learning the vehicle was stolen, they observed [New-

man] walk toward the house and try to enter it.

5) Based on Officer Pittatsis' training and experience, [Newman] behaved similarly to other individuals who are involved in criminal activity and try to distance themselves from that activity when police officers approach.[4]

6) While Officer Pittatsis was patting down [Newman] ..., [Newman] asked the officer how the vehicle could be stolen if it had the keys in it.

7) As this was occurring, Officer Roberts was interviewing the driver ... who was "very upset." Officer Roberts asked the driver if [Newman] had come to the house with her to which she answered "Yes, that's my boyfriend."

8) While Officer Pittatsis walked [Newman] back to the police car after placing him in handcuffs, Officer Roberts indicated to Officer Pittatsis that the defendant was a "number one," meaning he could be arrested. Thereafter, the offi-

**4.** The Court required the parties to submit supplemental briefing on the evidentiary foundation required to admit Officer Pittatsis' opinion. Fed.R.Evid. 104(a) relaxes the rules of evidence in suppression hearings. "The evidence need support 'only the probability, and not a prima facie showing, of criminal activity.' ... and such evidence need not be admissible, but only legally sufficient and reliable." *Franklin v. Fox,* 312 F.3d 423, 438 (citing *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). In determining if probable cause exists, officers may draw reasonable inferences from the facts and circumstances in light of their knowledge and prior experience. *Valencia,* 24 F.3d at 1108.

Under Fed.R.Evid. 701(c), lay witnesses may not offer opinion testimony "based on scientific, technical or other specialized knowledge within the scope of Rule 702." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court addressed the admissibility of scientific expert evidence and held that Fed.R.Evid. 702 imposes a "gatekeeping" obligation on the trial judge to "ensure that any and all scientific testimony is

not only relevant, but reliable." *Id.* at 589, 113 S.Ct. 2786. The Ninth Circuit has applied *Daubert* expert witness analysis to police officers seeking to offer their expert opinions on criminal behavior. *See, e.g., United States v. Figueroa–Lopez,* 125 F.3d 1241 (9th Cir. 1997).

Therefore, while under Fed.R.Evid. 104(a), Officer Pittatsis' opinion is reviewed under a relaxed standard of review. *Daubert,* of necessity, still requires that the Court first determine if the opinion testimony is relevant and reliable before allowing it to be considered as a basis for establishing probable cause.

First, Officer Pittatsis' opinion is reliable. Officer Pittatsis completed extensive training with the police department and has over five years of experience as a patrolman. Second, Officer Pittatsis' opinion is reasonably related to his experience. Newman's actions did display consciousness of guilt. Individuals only display consciousness of guilt after having committed a wrong, such as the crime of stealing a vehicle. Therefore, the Court will consider Officer Pittatsis' opinion when making its ruling on the Motion to Suppress.

cer searched the defendant and found drugs and a gun.

(Supp. Response at 2).

■ Officer Pittatsis, after informing the Court he understood the difference between a *Terry* stop detention and arrest, admitted he *informed Newman he was arrested* at the time he placed him in handcuffs. Therefore, Officer Pittatsis must have had probable cause to arrest Newman for his involvement with the stolen vehicle *at the moment he cuffed Newman and informed him of his arrest status*. *See Rohde*, 137 F.3d at 1144 (holding handcuffing and informing suspects they are under arrest sufficient to convert *Terry* stop into an arrest). The government's eighth enumerated reason for finding probable cause occurred *after* Officer Pittatsis placed Newman in handcuffs and informed him of his arrest status. Therefore, it cannot be used to establish probable cause for the arrest that had already occurred.

■ Further, since Officer Pittatsis never observed Officer Roberts' earlier hand signal indicating Officer Roberts' opinion that probable cause existed to arrest Newman, it cannot be considered under the collective knowledge theory. *See, e.g., Conner*, 948 F.Supp. at 842 (officer's observations were not pooled into the collective knowledge of the arresting officers because the officer did not tell the arresting officers what he learned nor did the arresting officers observe the officer's gesture indicating his finding).[5]

■ Finally, and significantly, the Government's reliance on Newman's spontaneous statement will not be considered to establish probable cause because, due to the ambiguity surrounding the timing of events and Officer Pittatsis' clarifying testimony in his colloquy with the Court, the evidence demonstrates that Newman made the comment after Officer Pittasis informed him of the arrest and placed him in handcuffs. *Compare* DR at 5 (stating comment occurred after Newman's arrest); TR at 33–4 (same); *with* TR 16–7 (indicating comment occurred while searching Newman, but before placing him under arrest); *see Rohde*, 137 F.3d at 1144 (holding events after the arrest cannot be part of the basis for establishing probable cause for the arrest).

■ Therefore, only the Government's first five enumerated bases for establishing probable cause have been considered. In *Rohde*, the Ninth Circuit held that when a person operates a vehicle she is effectively in possession of the vehicle and can reasonably be presumed to be aware of its ownership. *Rohde*, 137 F.3d at 1144. However, the reasoning that creates probable cause to arrest the driver does not extend to the passenger. *Id.* No probable cause exists for arresting a passenger "[a]bsent some indication of a relationship more substantial than that of driver and passenger, the arresting officer cannot simply impute the driver's presumptive awareness of the vehicle's legal condition to the passenger." *Id.* In *Rohde*, the Ninth Circuit suggested that if the arresting officers established the passenger of the car was the mother of the driver prior to arrest, this familial connection would have sufficed to presume the mother was aware of the vehicle's legal condition. *Id.* at 1144–45.

---

**5.** Even if the Court considered Officer Roberts' information, it fails to establish probable cause. The woman driver's ambiguous response of "Yes, he is my boyfriend" to a battery of questions by Officer Roberts creates only surmise that Newman accompanied her to the house in the vehicle knowing it was stolen. *See* DR at 12; TR at 69–70 (reciting Officer Roberts asked woman *several* questions before she responded, including (1) if the man standing at the front door was with her and (2) if he had been in the car with her).

 In this case, the government's evidence falls short of establishing that Officer Pittatsis knew Newman was a passenger in the vehicle. Newman's connection with the vehicle and the driver at the time of his arrest was even more nuanced than that of a passenger in *Rohde.* Newman was outside the vehicle and walking away from it. Moreover, Officer Pittatsis admitted he knew of no relationship between Newman and the driver prior to the arrest that would suggest that Newman would be aware of the vehicle's legal condition. While Officer Pittatsis knew of other stolen vehicles that had been recovered in the area and, his experience led him to conclude that Newman walked in a manner suggesting consciousness of guilt, the evidence is too tenuous to establish probable cause at the moment of the arrest. *See, e.g., Id.* Lastly, even if the Court considers Officers Roberts' and Pittatsis' testimony together, and in the most favorable light, despite the lack of communication between them, it is an assortment of inconsistent recollections of events such that the Court cannot with any degree of comfort discern when the moment of arrest occurred.[6] Obviously, this timing is necessary to determine whether probable cause existed. Therefore, the Motion to Suppress will be granted.

Accordingly,

**IT IS THEREFORE ORDERED** that Defendant Billy Ray Newman's Motion to Suppress is **GRANTED.**

---

6. For example, Officer Roberts' testified that Officer Pittatsis' responded to his hand signal by placing handcuffs on Newman, and presumptively arresting him (TR at 57), while Officer Pittatsis testified he never observed any hand signal prior to arresting Newman (TR at 16). Additionally, Officer Pittatsis stated at various times that he "immediately" arrested Newman (DR at 5), arrested Newman after a pat down (IR at 21); and arrested Newman after first "detaining him" and speaking with Officer Roberts (TR at 14–6).