**UNITED STATES of America,
Plaintiff,**

v.

**Carlos Enrique VELAZCO–
DURAZO, Defendant.**

**No. CR 04–0602–PHX–NVW.**

United States District Court,
D. Arizona.

March 4, 2005.

Glenn B. McCormick, U.S. Attorney's Office, Phoenix, AZ, for Plaintiff.

Antonio Rodriguez Zuniga, Esq, Law Office of Antonio R Zuniga, Phoenix, AZ, for Defendant.

## ORDER

WAKE, District Judge.

Defendant Carlos Enrique Velazco–Durazo is charged with marijuana and firearm offenses in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(vii), and 18 U.S.C. § 924(c). Before the Court is Defendant's Motion to Suppress evidence obtained from his home on June 3, 2004. He contends that he answered the door in response to an illegal seizure and did not voluntarily consent to police officers entering the home, which led them to discover the challenged evidence. The Court held an evidentiary hearing on this motion on January 18 and 25, 2005. The challenged evidence must be suppressed based on the facts proven at the hearing.

## I. Findings of Fact

The Court heard conflicting testimony on several points and resolves the conflicts based on the witnesses' demeanor, their likely ability to perceive and remember, the plausibility of their testimony, and their credibility. For the most part the Court is persuaded by the government's witnesses. Where the testimony of those witnesses conflicts, Detective Toulouse's probable cause affidavit of June 4, 2004, is more persuasive in light of its closeness to the events. Defendant's testimony was not credible in important specifics, but the Court does believe some of his testimony.

On June 3, 2004, Detective Daniel Toulouse of the Mesa Police Department received information from an anonymous source that a residence located at 4912 W. Pinchot Avenue, Phoenix, Arizona, was possibly being used as a marijuana "stash house," a place for storing large quantities

of drugs for later distribution. Later that day Detective Toulouse and another officer drove to and observed the house. They noted that the front door of the residence was secured by a metal security door and all of the windows facing the street were covered by blinds or curtains. They also noted a large double-door gate on the side of the property giving access to the backyard. No vehicles were parked in the driveway.

The officers then spoke with two of the neighbors. Both said they had witnessed some unusual or odd activity at the residence. One of the neighbors had observed several vehicles arrive at the residence and invariably pull into the garage, with the garage door closing immediately. Both neighbors said that they rarely observed anyone coming or going from the residence. One stated that whenever anyone did arrive at the house they would enter through the side gate into the backyard rather than the front door. One neighbor reported seeing a blue vehicle pull into the garage at 12:00 P.M. that day but was uncertain whether the vehicle was still in the garage. Both neighbors expressed fear of retaliation from the residents of the 4912 W. Pinchot address and refused to identify themselves to the police.

Based on the anonymous tip, his observations, and his conversations with the neighbors, Detective Toulouse determined that further investigation was necessary. He assembled a team of six detectives from the Mesa Police Department and one Phoenix police officer and advised them that they would conduct a "knock and talk" at the 4912 W. Pinchot residence. The purpose of the knock and talk was to obtain further information about activities at the house and ultimately to gain consent to enter.

Detectives Torres and DeLamater approached the front of the residence at approximately 9:00 P.M. on June 3, 2004. The house is on the north side of the street, with the centrally placed front door facing south. A porch light and living room window are to the east of the front door, and east of the window a wall of the garage projects south a few feet. Detective DeLamater took a position east of the living room window in the corner where the south-projecting garage wall meets the front wall of the house. Detective Torres, a Spanish speaker, directly approached the front door. Both officers were dressed in plain clothes, but Detective Torres wore a visible police badge on a lanyard around his neck, and Detective DeLamater wore a "raid vest." Both officers were visibly armed, but their weapons were not drawn. The other officers took positions out of the sight of the front door area, either along the door of the garage which juts out a few feet in front of the main structure or beside the side gate east of the garage door. The officers positioned along the garage door detected the odors of incense and cleaning products emanating from inside the garage. They recognized these odors as masking agents commonly used to conceal the odor of marijuana. However, they did not communicate what they smelled to Detectives Torres and DeLamater, who were unaware of the masking agents at that time.

Detective Torres knocked on the metal security door but not on the main front door, which was closed behind the security door. At first there was no response. Detective Torres continued knocking on the security door and also knocked on a couple of the windows beside the front door. The semi-continuous knocking on the security door lasted for approximately two and a half minutes, rising to a level of heavy pounding. While Detective Torres stood at the front door alternately waiting for a response and continuing to knock, Defen-

dant was in a bathroom at the rear of the house. He left the bathroom after hearing the knocking and turned off a light in the backyard, intending to flee out a rear door. Defendant decided not to exit the rear door after seeing some other lights shining in the backyard. At some point while he was knocking, Detective Torres announced that he was a police officer and wanted to know if someone would come to the front door and speak with him. Detective Torres did not use literal words of command, but together with the semi-continuous and eventually heavy pounding, his request was not one which could be easily refused. Indeed, Detective Torres testified that he intended to make contact if anyone was inside.

Defendant answered the door shortly after Detective Torres announced that he was a police officer and wanted someone to come to the door and speak with him. At first Defendant opened only the front door and not the security door. Only Detective Torres was then visible to him. Detective Torres identified himself in Spanish as a police officer and asked Defendant if he was the owner of the residence. Defendant responded that he was not but that he had been living there for one week. Detective Torres asked Defendant if he would speak with him. Defendant agreed. He opened the security door, closed the front door, and stepped outside. Detective DeLamater then became visible to him as well. Detective Torres informed Defendant that he was there to investigate a report of narcotics at the residence and asked if he could come inside to talk. The entire exchange from the time Defendant answered the door to the time Detective Torres requested to go inside took approximately fifteen seconds.

In response to Detective Torres' request to come inside, Defendant stated that he had no furniture in the house. He then turned and opened both the security door and the front door and walked inside. Detective Torres followed him inside. Immediately upon entering the house Detective Torres saw incense burning and detected a strong odor of unburnt marijuana. Defendant again stated that there was no furniture inside the house. Detective Torres turned around and leaned out the front door to report what he smelled to Detective DeLamater. Detective DeLamater then motioned and whispered to the other officers to follow him into the house. Moments later Detective Torres handcuffed Defendant. The officers conducted a protective sweep of the house during which they observed marijuana, packing materials, and a handgun. The police then obtained a warrant to search the house, which yielded a large quantity of marijuana, a scale, packing materials, and a firearm. Detective Torres acted within his understanding of the permissible bounds of a knock and talk.

## II. Defendant Was Seized Within the Meaning of the Fourth Amendment

■ The government contends that the initial encounter between Detective Torres and Defendant was a typical knock and talk procedure which does not require any objective suspicion. Defendant argues that the officers' conduct in summoning him to answer the door constituted a seizure requiring reasonable suspicion of criminal activity. He further argues that the police had no reasonable suspicion and the evidence must therefore be suppressed.

■ The general rule in the Ninth Circuit concerning knock and talk encounters is:

Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or

a condemned invasion of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States,* 327 F.2d 301, 303 (9th Cir.1964). In other words, a knock and talk is a consensual encounter. Consensual encounters between police officers and citizens are not seizures. *See Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). Whether the knock and talk in this case was a consensual encounter or a seizure turns on whether Defendant voluntarily opened the door or whether he opened the door in response to coercive circumstances. *See United States v. Cormier,* 220 F.3d 1103, 1109 (9th Cir.2000). "[A] seizure occurs only when 'police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *Id.* at 1110 (quoting *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). Whether an encounter is a seizure is determined based on the totality of the circumstances. *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382.

In *Cormier* the Ninth Circuit identified two sets of coercive circumstances that would transform a knock and talk into a seizure: (1) if the police compelled an occupant to open the door under the badge of authority and (2) if the police were unreasonably persistent in attempting to gain entry. *Cormier,* 220 F.3d at 1109

(citing *United States v. Winsor,* 846 F.2d 1569 (9th Cir.1988) (en banc), and *United States v. Jerez,* 108 F.3d 684 (7th Cir. 1997)). The court further noted that a nighttime encounter weighs in favor of a seizure. *Id.* at 1110.

 In this case, the police unreasonably persisted for approximately two and a half minutes in loud knocking rising to the level of heavy pounding on doors and windows in summoning Defendant to the door. By all indications they were not leaving until and unless Defendant came to the door. The duration and volume of the knocking was far more than necessary to announce their presence to anyone inside and greatly exceeded the knocking that, at 9:00 at night in this community, a reasonable person would take as an invitation to answer or not. As a whole, the officers' conduct was of an entirely different character than that of a neighbor or salesman on an ordinary visit. Although Detective Torres did not employ literal words of command, his announcement that the police wanted someone to come to the front door to speak with them when coupled with the unreasonably loud and persistent knocking would be taken by a reasonable person as an order, as indeed Defendant did take it. Certainly the police officers "convey[ed] a message that compliance with their requests was required." *Bostick,* 501 U.S. at 435, 111 S.Ct. 2382. When compliance with a request is required, the request is more accurately described as a demand. As the Ninth Circuit has stated, "compliance with a police demand is not consent." *Winsor,* 846 F.2d at 1573 n. 3 (internal quotations omitted). Under the totality of the circumstances—the unreasonably loud and persistent knocking, the announcement that the police wanted to talk with someone, and the nighttime setting—the conduct of the police would have communicated to a reason-

able person that he was not free to decline the officers' requests or otherwise terminate the encounter. Therefore, Defendant was seized within the meaning of the Fourth Amendment.

## III. The Seizure Was Not Supported by Reasonable Suspicion

█ Although Defendant was not initially arrested, the protections of the Fourth Amendment apply to his seizure. *See United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."). To satisfy the Fourth Amendment, such a seizure must be supported by "reasonable suspicion to believe that criminal activity may be afoot." *Id.* (internal quotations omitted). Reasonable suspicion requires a particularized and objective basis for suspecting criminal activity under the totality of the circumstances. *Id.* The government contends there was reasonable suspicion to believe that marijuana was being stored at the residence based on the anonymous tip, Detective Toulouse's observations, his conversations with the neighbors, and the odor of masking agents such as cleaning products and incense which some of the officers detected in the area of the garage. The Court will consider each factor in turn, and in their entirety.

### A. The Anonymous Tip

█ To give rise to reasonable suspicion, an anonymous tip must include a range of details and predict future actions by the suspect that are subsequently corroborated by independent police observation. *United States v. Morales*, 252 F.3d 1070, 1076 (9th Cir.2001); *United States v. Thomas*, 211 F.3d 1186, 1190 (9th Cir.2000)

("Courts will uphold an investigatory stop based on a tip or other secondary information only when the information possesses sufficient indicia of reliability that are independently corroborated by the police."). An informant's veracity, reliability, and basis of knowledge are highly relevant in determining whether reasonable suspicion exists. *Alabama v. White*, 496 U.S. 325, 328–29, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). "An anonymous tip standing alone does not demonstrate an informant's veracity or reliability because an anonymous tipster cannot be held accountable if he or she provides inaccurate information, and the police cannot assess the tipster's reputation." *Morales*, 252 F.3d at 1074.

In *Thomas* an FBI agent suggested that local law enforcement officers " 'might want to pay particular attention to a certain house' based on 'a suspicion that there was a possibility that there might be some narcotics' there". *Thomas*, 211 F.3d at 1189. The Ninth Circuit held that tip insufficient to establish reasonable suspicion to stop a car leaving the house. *Id.* at 1190. The court treated the FBI agent's tip as anonymous because it did not include any information about the source of the tip. *Id.* As such, it did not suffice for reasonable suspicion because it was devoid of specifics concerning the occupants of the house, the vehicles involved, the conduct observed, or the kind of narcotics alleged to be present. *Id.* at 1189. The FBI agent's tip lacked any indicia of reliability "and was too vague and generalized to play any part in the reasonable suspicion calculus." *Id.* Although the local police subsequently conducted surveillance of the house based on the FBI agent's tip, "if suspicious activity had subsequently been observed at the house, any finding of reasonable suspicion would have to rest on that observation alone and not, in whole or in part, on the FBI tip." *Id.*

■ Aside from identifying marijuana as the specific narcotic involved, the anonymous tip in this case is as devoid of specifics as the tip in *Thomas*. The tip provided no details beyond the bare allegation of criminal activity, no predictive information, and no information that was or could have been corroborated by independent police observation. Thus, the information provided no means for the police to test the informant's knowledge or credibility. *See Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). That the anonymous tip identified marijuana as the drug involved does not make it any less conjectural and conclusory than the tip in *Thomas*. *Thomas*, 211 F.3d at 1190. As in *J.L.*, where the police received an anonymous tip that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun, the police in this case had no basis for believing that the informant had reliable knowledge of concealed criminal activity. *See J.L.*, 529 U.S. at 272, 120 S.Ct. 1375; *cf. White*, 496 U.S. at 332, 110 S.Ct. 2412 ("What was important was the caller's ability to predict respondent's future behavior, because it demonstrated inside information—a special familiarity with respondent's affairs.").

Moreover, it is not sufficient that the officers' observations failed to dispel the anonymous source's suggestion of criminal activity. Independent police corroboration of details of the anonymous tip suggests that "because an informant is right about some things he is more probably right about other facts ... including the claims regarding [defendant's] illegal activity." *Morales*, 252 F.3d at 1075 (quoting *United States v. Fixen*, 780 F.2d 1434, 1437 (9th Cir.1986)). That rationale does not apply here, where the police investigation corroborated nothing from the anonymous source. *See J.L.*, 529 U.S. at 271, 120 S.Ct. 1375 (noting that the reasonableness

of official suspicion is measured prior to the intrusion).

The conclusory and unspecific anonymous tip lacked any indicia of reliability and therefore cannot support a finding of reasonable suspicion. *Thomas*, 211 F.3d at 1190. Consequently, even if subsequent investigation revealed suspicious activity, a finding of reasonable suspicion would have to rest only on that investigation and not on the anonymous tip. *Id.*

**B. Detective Toulouse's Observations**

■ The government also relies on Detective Toulouse's observations after receiving the anonymous tip. He observed that a metal security door secured the front door, the front windows were covered by blinds or curtains, a large gate on the side of the property allowed easy access to the backyard, and no vehicles were parked in the driveway, in contrast to most of the other driveways in the neighborhood.

■ None of these observations, individually or taken as a whole, give rise to reasonable suspicion. The metal security door and the closed blinds, if anything, weigh against a finding of reasonable suspicion. Although it may be in a criminal's best interest to conceal his activity and excessive acts of concealment may therefore raise suspicion, the steps one takes to obscure one's activities from the public view also bear on one's expectation of privacy. *See United States v. Nerber*, 222 F.3d 597, 603 (9th Cir.2000) (finding that defendants who closed the door and drew the blinds to their hotel room had a subjective expectation not to be videotaped in that room). "To invoke the protections of the Fourth Amendment, a person must show that he had a 'legitimate expectation of privacy.' To establish a 'legitimate' expectation of privacy, he must demonstrate

a subjective expectation that his activities would be private, and he must show that his expectation was 'one that society is prepared to accept as reasonable.'" *Id.* at 599 (quoting *Bond v. United States,* 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000)); *see also Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 ("[T]he Fourth Amendment protects people not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection ... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."). Reasonable suspicion is not measured by suspicion alone. "The touchstone of our search and seizure jurisprudence remains the Fourth Amendment's textual requirement that any search be 'reasonable,' a determination we make by weighing the competing interests of individual security and privacy with the need to promote legitimate governmental interests." *United States v. Terry–Crespo,* 356 F.3d 1170, 1176 (9th Cir.2004). In observing the metal security door and the closed blinds at Defendant's home, Detective Toulouse encountered a significant privacy interest. *See United States v. Gori,* 230 F.3d 44, 51 (2d Cir.2000) ("Fourth Amendment privacy interests are most secure when an individual is at home with doors closed and curtains drawn tight."). These observations cannot also provide the suspicion of criminal activity needed to outweigh that privacy interest. It might be different if the residence was guarded and concealed by far more than would be necessary to maintain an ordinary person's privacy and security, but that is not the case here. Defendant was not required to choose between forfeiting the protections of the Fourth Amendment by opening his home to public view or arousing reasonable suspicion to permit a seizure by protecting his privacy.

The existence of a side gate and the absence of vehicles in the driveway also fail to give rise to reasonable suspicion. The government argues that the side gate would allow people to enter the property to make deliveries without being seen. Although one neighbor reported seeing people use the side gate to enter the property on foot, that report does not support Detective Toulouse's theory that the side gate would be used to make concealed deliveries. Moreover, even if the gate was used to enter the property, any such entries, without more, would be entirely consistent with lawful activity. An inference of criminal conduct from an ordinary feature of a residence which could facilitate criminal or lawful activity alike is far too attenuated to support reasonable suspicion. *See Thomas,* 211 F.3d at 1190–91 (finding that unremarkable comings and goings, though possibly consistent with drug activity, could not form any part of the reasonable suspicion analysis). Similarly, the absence of vehicles in the driveway, even if atypical in that neighborhood, provided no indication of illegal activity in the residence. Although the Court analyzes the facts in light of the officer's experience, *see id.* at 1191, the facts must suggest "more than the mere subjective impressions of a particular officer." *See id.* (internal quotations omitted). Detective Toulouse did not explain how the absence of vehicles in a driveway suggests criminal activity. Indeed, the absence of vehicles more likely indicates an absence of any activity, criminal or otherwise.

### C. The Neighbors' Reports

█ Like Detective Toulouse's firsthand observations, the neighbors' reports failed to describe any criminal activity and do not support a reasonable inference that criminal activity was afoot. As noted above, the use of a side gate to enter the

residence is entirely consistent with lawful activity, as is the report that several different vehicles were seen at the residence and that those vehicles would pull into the garage. The neighbors reported seeing only three or four different vehicles, and the police had no information as to whether the people coming and going were residents, family members, frequent visitors, or strangers. *See Thomas,* 211 F.3d at 1190. Moreover, the conduct described by the neighbors was only arguably unusual, and certainly not so unusual that it could be described as "furtive." *Cf. id.* at 1190–91 (noting that furtive conduct by people coming to and going from a residence such as driving in "counter-surveillance fashion" and waiting for signals from a lookout can be accepted as indicia of illegal activity).

### D. The Odor of Masking Agents

The detection of an odor known to a police officer to be commonly used to mask the presence of narcotics can weigh in favor of reasonable suspicion. *See United States v. Rojas–Millan,* 234 F.3d 464, 470 (9th Cir.2000). In this case, however, the officers who detected the odor of incense and cleaning products emanating from the garage did not seize Defendant. Detective Torres, the seizing officer, did not sense any odor until after he seized Defendant and entered the residence. Therefore, for the odor of masking agents to support reasonable suspicion, Detective Torres must be entitled to rely upon the knowledge of the other officers.

Under the "collective knowledge rule," information known to other officers may support a finding of reasonable suspicion even if the specific facts known to them are not communicated to the detaining officer prior to the investigatory stop. *See Terry–Crespo,* 356 F.3d at 1177; *United States v. Newman,* 265 F.Supp.2d 1100, 1106–07 (D.Ariz.2003) ("[T]he officer in-

volved in a stop is not required to be personally aware of all the facts justifying the intrusion upon the defendant's Fourth Amendment rights. It suffices if the officer, aware of such facts, *relays* his reasonable suspicion to the officer effecting the *Terry* stop, *who may then rely upon it.*") (emphasis in original). The collective knowledge rule applies to both arrests and investigatory stops. *Id.* at 1107. However, there must be at least some minimal level of communication among the officers in order to apply the rule. *Newman,* 265 F.Supp.2d at 1107–08. For example, in *United States v. Bernard,* 623 F.2d 551, 560–61 (9th Cir.1979), the arresting officer could rely on information known to two other officers because they communicated their opinions regarding probable cause to him. In *Newman* the police lacked probable cause to arrest the defendant, who was observed walking away from a stolen vehicle. The arresting officer did not know of a relationship between the defendant and the driver of the vehicle that would justify imputing to the defendant the driver's presumptive knowledge that the vehicle was stolen. The driver told the non-arresting officer that the defendant had been in the car with her and was her boyfriend. *Newman,* 265 F.Supp.2d at 1109–10, 1103. The non-arresting officer then attempted to signal to the arresting officer that there was probable cause to arrest the defendant. *Id.* at 1103. However, because the arresting officer did not observe the signal, the non-arresting officer's knowledge could not count as a basis for probable cause. *Id.* at 1109.

In this case, the officers who detected the odor of masking agents did not communicate that fact to Detective Torres, nor did they suggest to him before the seizure that they had reasonable suspicion of criminal activity. Detective Torres' later knowledge of masking agents cannot

form the basis of reasonable suspicion because it came after the seizure. *See J.L.,* 529 U.S. at 271, 120 S.Ct. 1375.

### E. The Valid Factors Viewed as a Whole

The Court must evaluate the officers' objective suspicion in light of the totality of the circumstances and must not view the factors relied upon by the police in isolation. *See Arvizu,* 534 U.S. at 266–67, 122 S.Ct. 744. Nonetheless, on this record the anonymous tip and the odor of masking agents carry no weight. As a result, all that remains are Detective Toulouse's observations and the neighbors' reports of unusual activity. When viewed together these factors give rise at most to a suspicion that there was *unusual* activity taking place at the residence. Such a suspicion does not provide a "particularized and objective basis" for suspecting *criminal* wrongdoing. Therefore, the seizure was unreasonable.

### IV. The Consent to Enter the Residence Was Invalid

 A consent to search following an illegal seizure is valid only if "subsequent events have purged the taint" of the illegal seizure. *United States v. Bautista,* 362 F.3d 584, 592 (9th Cir.2004) (internal quotations omitted); *see also Orhorhaghe v. I.N.S.,* 38 F.3d 488, 499–501 (9th Cir. 1994) (finding both illegal seizure and involuntary consent independent grounds to exclude evidence). Whether subsequent events have purged the taint of the illegal seizure depends on the closeness in time between the illegal seizure and the consent as well as any intervening circumstances. *Bautista,* 362 F.3d at 592. The government bears the burden of demonstrating that the taint has been purged. *See United States v. Twilley,* 222 F.3d 1092, 1097 (9th Cir.2000).

In this case, Defendant permitted Detective Torres to enter the residence less than a minute after he was illegally seized. Although Defendant manifested consent to the entry by turning and walking into the house after Detective Torres asked to talk inside, there was no "break in the chain of events," *see Twilley,* 222 F.3d at 1097, between the illegal seizure and Defendant's consent to entry. Consequently, Defendant's consent was tainted and the evidence obtained pursuant to it must be suppressed. *See Bautista,* 362 F.3d at 592.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress (doc. # 18) is granted.